STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, PLAINTIFF, V. LAWRENCE B. GOLDMAN, DEFENDANT.

FILED JUNE 8, 1934. No. 28593.

*Paul F. Good, Attorney General,* and *William C. Ramsey,* for plaintiff.

*Lawrence B. Goldman, pro se.*

Heard before ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and LESLIE and RYAN, District Judges.

PAINE, J.

A complaint for disbarment was filed in this court by

C. A. Sorensen, attorney general, against the defendant, and served upon him by the sheriff of Douglas county on August 27, 1932, and later an amended complaint was filed.

Carroll O. Stauffer, a former district judge, was appointed referee, and a trial was begun before him on November 13, 1933. The bill of exceptions of the evidence taken before him consists of 3 volumes of 1,221 pages, including 94 exhibits, largely of photostatic copies of checks, attorneys' liens, letters, receipts, and notes.

At the beginning of the trial, the first witness called was Mary Grabarkiewicz, who testified that she lived in Milwaukee, Wisconsin, and sustained an accident while going through Axtell, Nebraska, in May of 1932, and was taken to the Brewster Hospital at Holdrege, where she remained six weeks, and then was taken to a private house for further treatment; that, while she had never met or heard of the defendant before, on June 8 he came to Holdrege and solicited her to employ him in her claim for damages, and induced her to accompany him to Omaha in his automobile. She there remained in the St. Joseph Hospital for some time, and later in Stuntz Hall.

That on July 11 she signed an attorney's employment contract, agreeing to pay the defendant 33 1/3 per cent. of any amount recovered. While he had represented to her that he thought he could secure $5,000 damages, yet on August 3 she signed a contract of settlement and release, and a check was thereupon delivered by a Burlington representative for $2,100, payable to "Miss Mary Grabarkiewicz and her attorney, L. B. Goldman," payable at the Continental Illinois Bank & Trust Company or the First National Bank of Chicago. She was induced to indorse this check in blank, and delivered the same to the defendant, who promptly cashed the same. She thereafter telephoned repeatedly to his office, and on those occasions when she reached him was promised several times that he would make settlement with her "tomorrow." Finally, on August 18, he gave her his check for

$1,300 on the Union State Bank of Omaha, adding $100 for her trouble. Payment was refused on the check for want of sufficient funds. On September 24, 1932, Henry J. Beal, county attorney, filed an information against the defendant in the district court for Douglas county for embezzlement of said sum of $1,200.

Another charge was filed against the defendant by the attorney general because of a transaction with a client, Maurice W. Snyder, who sustained injuries about December 21, 1931, while employed as a brakeman near Grand Island, Nebraska, and was solicited to, and did, employ defendant, and is based upon these facts: A check was received in full settlement from the Burlington railroad on May 9, 1932, and the defendant induced his client, Maurice W. Snyder, to indorse the same in blank, and defendant thereupon collected the proceeds thereof, and retained a portion thereof belonging to his client. There was filed in this court on May 18, 1933, an affidavit of said Maurice W. Snyder, setting out that the balance of $550, owed to him by the defendant, has been settled by promissory notes of the defendant, and that the affiant is confident that said notes will be paid in due course, and that the said Snyder is unwilling that the said Goldman be disbarred on account of any transaction with him, which affidavit is sworn to before Herman Corenman, notary public.

After the trial the referee filed his report in this court, embracing his findings of fact and conclusions of law. He found that, although repeated demands were made, the defendant did not pay to Mary Grabarkiewicz the $1,200 due her until after the original complaint was filed in this action, and until after a complaint for embezzlement had been filed against him, and that he failed and refused to pay to his client, Maurice W. Snyder, the sum of $2,100 due from said settlement, and that he had only partially paid the same at the time of the hearing before the referee herein, and was still indebted in a sum in excess of $400 and interest.

With reference to that part of the complaint set out in paragraph 3, the referee finds, in brief, that the defendant, personally and through hired agents, employees, and runners, has continuously made a practice of what is commonly known as "ambulance chasing," being the active and urgent solicitation of contracts for legal services in collecting damages for personal injuries sustained by clients in automobile collisions, railroad wrecks, and other mishaps; that such solicitation has been made by the defendant among persons theretofore having no acquaintance and no personal business or professional conduct with the defendant, and who, but for such solicitation, would not have engaged the services of the defendant as attorney.

The evidence discloses that the defendant, by one pretext or another, succeeded in getting the checks for the payment of clients' damages into his possession, indorsed by his clients, and that his method, as shown by the proof in this case, was then to consider this entirely as a civil debt and, if he could settle the same by post-dated checks or by any subterfuge or inducement or succeed in getting his clients to take his own unsecured notes for the amount justly due them, he considered that such settlement absolved him of any wrong-doing in the matter, and that such settlement, made by checks or notes, even if. the same were not collectible according to their terms, changed the obligation to a civil liability on his part, which could not be availed of by the attorney general in proceedings to disbar him.

The matter is not only pending upon the report of the referee, with a motion of the attorney general for judgment thereon, but also upon a motion of the defendant asking for 30 days longer within which to file additional briefs. However, the defendant on May 1, 1934, filed a 29-page brief in his behalf. In this brief he insists that he is presumed to be innocent, and that proof necessary to revoke a license to practice law must be clear and convincing to a reasonable certainty; that is, to be practically

equivalent to proof beyond a reasonable doubt. It is also insisted by the defendant in his brief that, if there is any reasonable doubt from either the law, the rules, the pleading, or the evidence, as to the existence of the power of this court to deprive the defendant of his valuable right to practice law, that doubt should be resolved against the exercise of such authority.

On April 4, 1934, Howard Saxton and John E. Eidam filed their written withdrawal as attorneys for the defendant in this case, and the case was argued to this court on May 7, 1934, by the defendant *pro se* and the attorney general.

Fortunately, cases of this nature are very rare, but when the proof is clear this court has not hesitated to discipline attorneys who have failed to live up to the high standards of the legal profession, and in the past the recommendations of the referees appointed in similar cases have, with rare exceptions, been adopted.

No office offers greater opportunity for honorable service than that of an attorney, and he is required to uphold the ideals of this profession. Into his hands, without bonds, are entrusted the savings of the widow, the inheritance of the helpless orphan, the settlement of estates, and the only guaranty that this trust will be honorably executed by him is the character of the lawyer, as established by his reputation and conduct. As soon as a lawyer so conducts himself that confidence can no longer be placed in him with safety, his usefulness to his clients, the court, and the state has ceased. When he betrays helpless clients, and deprives them of their property, which he was employed to secure, by converting the same to his own use, it matters not what subterfuge he uses, such act will not be countenanced by this court.

In an old case of *Ex parte Bayley*, 9 Barn. & Cress. (Eng.) 691, decided July 3, 1829, Lord Tenterden, the chief justice, said: "I am of opinion that this case is not to be decided by any strict rule of law. The court exercises a jurisdiction over attorneys, and that is to be exercised

according to law and conscience, and not by any technical rules."

"Since the passage of the act .of 1895 (ch. 6) the power to license to practice in the courts of Nebraska has been taken from the district courts and lodged exclusively in the supreme court." *In re Admission to the Bar,* 61 Neb. 58.

"This court alone can pass upon the qualifications of applicants for admission to the bar, and has sole power to annul such admission." *In re Disbarment Proceedings of Newby,* 76 Neb. 482. See *State v. Fisher,* 103 Neb. 736.

Our court has held, *In re Newby,* 82 Neb. 235, that disbarment proceedings are not criminal in their nature, but that culpability must be established by a clear preponderance of the evidence; while in *Morton v. Watson,* 60 Neb. 672, this court said that a disbarment proceeding was neither in form nor substance a civil or a criminal action. *People v. Goodrich,* 79 Ill. 148; *State v. Burr,* 19 Neb. 593; *In re Dunn,* 85 Neb. 606; *Boston Bar Ass'n v. Casey,* 211 Mass. 187, 39 L. R. A. n. s. 116, Ann Cas. 1913A, 1226.

It is not essential that a conviction of an attorney for a crime committed be first had as a basis of disbarment on account of the acts charged.

The measure of good faith which an attorney is required to exercise with his client is of a much higher standard than is required in business dealings where the parties trade at arm's length and engage in a battle of wits to outtrade each other, where the advantage is sought and attained at the expense of candor and ofttimes truth.

The burden is on the attorney to show that the transaction is fair and equitable, and that the client is fully informed of his rights and interests in the matter. An attorney cannot withhold from his client information acquired as his attorney and use the same to extort increased compensation from him, and is not allowed to coerce his client into a contract that he would not enter into if he had full information. All dealings between an attorney

and a client who claims to have been wronged are closely scrutinized by the court.

From the moment a client's money comes into the possession of an attorney, it should never be viewed as creating a relation of debtor and creditor, but such money should always be considered by such attorney as trust funds, and promptly paid in full, strictly according to the terms of the contract. 2 R. C. L. 966, sec. 42; *Armstrong v. Morrow,* 166 Wis. 1, Ann Cas. 1918E, 1156; *Berman v. Coakley,* 243 Mass. 348, 26 A. L. R. 92; *Garceau v. McNamara,* 125 Minn. 130; *Moore v. Rochester Weaver Mining Co.,* 42 Nev. 164, 19 A. L. R. 830; *State v. Scoville,* 123 Neb. 457; *State v. Kennedy,* 124 Neb. 789; *State v. Black,* 125 Neb. 382.

Where an attorney receives money belonging to his client, and wrongfully deprives his client thereof by refusing to give it up on the demand of the client, this will be considered as conduct violating the oath of an attorney.

"Misappropriation by an attorney of money belonging to his client is such a disregard of duty as to warrant disbarment." *State v. Priest,* 123 Neb. 241. See *State v. Kennedy,* 124 Neb. 789.

It is the absolute duty of an attorney to notify his client of a collection made on his account, and to make remittance to him, less proper charges, as soon as he reasonably can do so after the receipt of the client's money. The practice of retaining this money, upon one pretext or another, for an indefinite period, deserves the severest censure. *People v. Smith,* 290 Ill. 241.

An attorney is not an officer of the state, in a constitutional or statutory sense of that term, but he is an officer of the court, exercising a privilege during good behavior.

It is well settled that a court which has the power to license attorneys to practice law has inherent power to disbar them from further practice by a judicial act. *In re Greathouse,* 189 Minn. 51.

"The purpose of a disbarment proceeding is not so much to punish the attorney as it is to determine in the

public interest whether he should be permitted to prac-
tice." *State v. Priest,* 123 Neb. 241. See *State v. Ireland,*
125 Neb. 570.

This defendant is charged with "ambulance chasing."
In examining this matter, we find that the oath required
of an attorney for admission to practice law, as set out
in section 7-104, Comp. St. 1929, is very simple, and reads
as follows: "You do solemnly swear that you will sup-
port the Constitution of the United States, and the Con-
stitution of this state, and that you will faithfully dis-
charge the duties of an attorney and counselor, according
to the best of your ability." And the next section spe-
cifically defines the duties which an attorney must dis-
charge, among which we find one in which he agrees to
abstain from all offensive practices.

The American Bar Association is a national organiza-
tion, having a very large membership of leading attorneys
from every state in the Union, and it adopted at its
thirty-first annual meeting in Seattle, Washington, on
August 27, 1908, canons of professional ethics for the
purpose of maintaining confidence in the integrity and im-
partiality of our courts, and setting out in detail the
duties of lawyers in the conduct of professional business
with their clients, and canon 28, so adopted, reads as
follows:

"It is unprofessional for a lawyer to volunteer advice
to bring a lawsuit, except in rare cases where ties of
blood, relationship or trust make it his duty to do so.
Stirring up strife and litigation is not only unprofes-
sional, but it is indictable at common law. It is disrepu-
table to hunt up defects in titles or other causes of action
and inform thereof in order to be employed to bring suit,
or to breed litigation by seeking out those with claims
for personal injuries or those having any other grounds
of action in order to secure them as clients, or to employ
agents or runners for like purposes, or to pay or reward,
directly or indirectly, those who bring or influence the
bringing of such cases to his office, or to remunerate

policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the Bar, having knowledge of such practices upon the part of any practitioner, immediately to inform thereof to the end that the offender may be disbarred."

We realize that attorneys have often complained that, if they were not aggressive along these lines, the claim agents of certain corporations would have already secured releases from the injured parties. This court cannot discipline laymen, but their unwarranted conduct does not excuse unethical practice on the part of attorneys.

It is insisted that this court has never determined whether "ambulance chasing" is unethical. The conduct of the defendant in this case brings the question squarely before us, and we now hold that such practice is unethical and unprofessional, and subjects such attorney to the discipline of this court. *In re Greathouse,* 189 Minn. 51.

We believe that an order of temporary suspension would be inadequate in this case, and that it would be a grave injustice to other members of his profession to permit defendant to continue to practice law in Nebraska. The referee in this case recommends an order of disbarment, and we approve and confirm the same, and direct that his admission to practice law shall be canceled and annulled, and his name stricken from the roll of attorneys licensed to practice in Nebraska.

JUDGMENT OF DISBARMENT.

DAY, J., concurs in the result.