STATE, EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, V. LEE BASYE, RESPONDENT.

295 N. W. 816

FILED JANUARY 10, 1941. No. 30672.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke,* for relator.

*Lee Basye, pro se,* and *Clinton Brome* and *Richard O. Johnson,* for respondent.

Heard before ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and TEWELL, District Judge.

CARTER, J.

This is a disciplinary proceeding brought by the state of Nebraska on the relation of the Nebraska State Bar Association against Lee Basye, a duly licensed attorney at law, seeking his disbarment because of unethical practices and conduct. The matter was referred to the Honorable Jean B. Cain as referee to make findings of fact and conclusions of law. The proceeding is now before us on the report of the

referee finding that respondent violated his oath of office by engaging in unprofessional and unethical conduct and practice, and the exceptions of the respondent thereto.

The complaint alleges that respondent adopted and pursued a systematic course of conduct and practice, commonly called "ambulance chasing," wherein he violated his oath of office and the ethics of the profession of the law. It is alleged that such conduct and practices were carried on directly by the respondent and through agents and runners of the respondent in securing employment as an attorney by solicitation to bring actions for personal injuries and property damage arising out of automobile collisions and other mishaps.

There is evidence in the record of many cases which were obtained by this unethical and unprofessional means and method. We will content ourselves with a detailed examination of the evidence relating to one case only.

It appears from the record that on or about June 22, 1936, one Delores Pauline Creps was fatally injured by a truck owned by S. Carveth & Son. About a week later, one George E. Hinckle called at the home of Cecil Creps, the father of the deceased, and solicited the case for this respondent. Hinckle called six or seven times, and Creps finally signed a contract authorizing respondent to handle the case on a contingent fee basis of 40 *per centum* of any amount recovered. Subsequently, respondent called at the Creps home and caused another contract to be executed, which he himself signed. Suit was brought and the case settled for $300, of which Creps received $198.

The evidence shows that George E. Hinckle was a professional "ambulance chaser" of long experience. He became acquainted with respondent about 1933 and talked with him many times about the personal injury business. Eventually, an oral agreement was made whereby Hinckle was to receive 20 *per centum* of all fees collected, plus expenses. Solicitations were commenced and many cases secured in this fashion.

Respondent contends that Hinckle was used only as an

investigator and that the charge of "ambulance chasing" is without any foundation in fact.

The evidence clearly preponderates in favor of the relator. The record is filled with evidence of cases solicited by Hinckle that unfailingly came to respondent's office. It is very evident that this was not the result of coincidence or chance. There is evidence in the record of more than ten other cases solicited in this manner, some of which are established beyond question. Without a detailed discussion of each, we conclude that the charge of "ambulance chasing" is amply supported by the record.

Such conduct, when established, constitutes unethical and unprofessional practice and subjects a lawyer, duly admitted and licensed to practice law, to the disciplinary powers of the supreme court. *State v. Goldman,* 127 Neb. 340, 255 N. W. 32; *State v. Hinckle,* 137 Neb. 735, 291 N. W. 68.

Respondent is also charged with defrauding a client in the manner hereinafter set out.

It appears that on January 11, 1918, one John J. Dean died, leaving his widow and a son, Fulton Dean, then 18 months of age. As a result of her husband's death, Alice Dean received $10,000 from the Chicago, Burlington & Quincy Railroad. One-half of the net proceeds, amounting to $4,250, belonged to the son. Alice Dean was appointed guardian, and in June, 1924, respondent prevailed upon said Alice Dean as guardian to loan to respondent the $4,250 which she held in trust for her son and ward. As security for such loan, respondent executed and delivered a mortgage upon a farm owned by himself which he then represented to be a first mortgage lien upon said farm when he well knew that a binding prior mortgage in the amount of $2,300 was of record. At the time of the hearing before the referee, a suit for the foreclosure of the first mortgage was pending. It has been called to our attention by documentary evidence not properly in the record that the $2,300 first mortgage has been in some manner adjusted and a decree entered adjudging the $4,250 to be a first lien on the mortgaged premises. It is quite evident from the record that, even if this

be true, for approximately 15 years the $4,250 mortgage stood as a second lien and that its priority over the $2,300 was established by respondent only under the pressure of the instant proceeding. That the relation of attorney and client existed is not disputed. The evidence establishes that Alice Dean reposed complete confidence in the respondent and relied upon the confidence which he had established as her legal adviser. The record fairly shows that respondent knew his conduct was unbecoming of an attorney, which is specifically evidenced by the fact that the mortgage was made to one Charles Brittan and assigned to Alice Dean without any explanation or reason shown by the record for so doing. The fact that respondent chose a circuitous method of imposing upon and taking advantage of his position as attorney does not justify such action nor relieve him from the penalties that necessarily follow such culpable conduct. The relationship of attorney and client has always been recognized as one of special trust and confidence. While the law does not prohibit business dealings between an attorney and his client, it does impose the requirement that they shall be characterized by the utmost fairness and good faith, and where it appears that this requirement has been intentionally disregarded and the client has suffered as a result thereof, the attorney subjects himself to the disciplinary powers of the court.

Respondent's misconduct has extended over a long period of time. There is no evidence in the record of any moral regeneration. In fact, the respondent attempts to justify his conduct and urges that he has done no wrong. He contends that it cannot be demonstrated that financial loss has resulted to any of his clients as a result of his conduct, and completely ignores the fact that it is his moral fitness to engage in the practice of law that is being questioned and not the degree of success he may have had in the use of unethical methods.

We cannot agree that this proceeding is barred by lapse of time. It comes squarely within the rule announced in *State v. Fisher*, 103 Neb. 736, 174 N. W. 320, wherein this

court said: "When the misconduct of an attorney has been practically continuous, and there is no evidence of reformation or change of conduct, disbarment will not be barred by lapse of time as to any of such misconduct."

We conclude that the findings of the referee are amply sustained by the record and that the duty rests upon this court to order the admission of Lee Basye to the bar of this state canceled and annulled, and his name stricken from the roll of attorneys and counselors at law.

JUDGMENT OF DISBARMENT.