**DOMBEY, In re.**

Common Pleas Court, Franklin County.

No. 189110.   Decided July 3, 1954.

James M. Hengst, John W. King, William L. Schmidt, Columbus, Committee for the Bar Association.

John J. Chester, Columbus, for Alex S. Dombey.

(BELL, J, of Hamilton County, sitting by assignment in Franklin County.)

## OPINION

By BELL, PJ.

The Columbus Bar Association, after receipt of two complaints, brought to the knowledge and attention of the judges of this court that Alex S. Dombey, in his office as an attorney at law, probably had been guilty of misconduct or unprofessional conduct involving moral turpitude.

In pursuance to the requirement of the statute (§4705.02 R. C.), the court appointed James M. Hengst, John W. King and William L. Schmidt, three attorneys at law, as a committee to investigate the matter, and if the facts warranted action, to prepare and file written charges against the accused.

On January 18, 1954, the committee filed with the clerk of courts written charges and specifications against Dombey. The charges read:

### CHARGE 1.

"That the said Alex S. Dombey now is and was at the times hereinafter set forth an attorney-at-law duly admitted to practice as such in all the courts of this state and practicing in this court and that as such attorney-at-law he was at the times and in the manner hereinafter set forth guilty of misconduct in his said office as an attorney-at-law involving moral turpitude.

### CHARGE 2.

"That the said Alex S. Dombey now is and was at the times hereinafter set forth an attorney-at-law duly admitted to practice as such in all the courts of this state and practicing in this court and that as such attorney-at-law he was at the time and in the manner hereinafter set forth guilty of unprofessional conduct involving moral turpitude."

Seven specifications were filed setting forth the claimed acts upon which the charges were based.

Nine days thereafter, Dombey, as respondent, filed an answer, in which, after admitting that at all times mentioned in said charges he was an attorney at law, he denied the charges.

On March 30, 1954, by leave of court (the Presiding Judge not participating), the committee filed an "Amendment to Charges and Specifications" consisting of fifteen additional specifications of acts of alleged misconduct or unprofessional conduct involving moral turpitude.

Subsequent thereto, at the request of the judges of the court, Chief Justice Weygandt of the Supreme Court of Ohio appointed Honorable Albert V. Baumann, Judge of the Court of Common Pleas of Sandusky County, Honorable John W. Ford, a Judge of the Court of Common Pleas of Mahoning County, and the writer, a Judge of the Court of Common Pleas of Hamilton County, to hear and determine these charges. The charges were heard by those judges, sitting by assignment as Judges of the Court of Common Pleas of Franklin County.

The charges are bottomed upon the provisions of §4705.02 R. C. (§1707 GC), which grants authority to Courts of Common Pleas in this state to hear and determine a proceeding for suspension or removal of an attorney from his office. That section reads as follows:

"**The Supreme Court, Court of Appeals, or Court of Common Pleas may suspend or remove an attorney at law from office or may give private or public reprimand to him as the nature of the offense may warrant, for misconduct or unprofessional conduct in office involving moral turpitude, or for conviction of a crime involving moral turpitude. Such**

suspension or removal shall operate as a suspension or removal in all the courts of the state. The clerk of court upon such suspension or removal shall send a copy thereof to the Supreme Court, the Court of Appeals and to the federal court of the district in which said attorney resided at the time of the trial for such action as is warranted. **Judges of such state courts are required to cause proceedings to be instituted against an attorney, when it comes to the knowledge of any judge or when brought to his knowledge by the bar association of the county in which such attorney practices that he may be guilty of any of the causes for suspension, removal, or reprimand."** (Emphasis supplied.)

Before proceeding to a consideration of the evidence, there are four preliminary questions to be resolved. Each will be disposed of in the order stated:

1. Has the court jurisdiction to hear and determine these charges?

2. Has this court inherent power to reprimand, suspend or disbar an attorney at law, irrespective of the statute?

3. Has the committee the right to call the respondent and proceed to examine him as upon cross-examination?

4. Is the testimony contained in depositions competent to be read in evidence upon the trial of a disbarment proceeding?

At the conclusion of the opening statement of the committee, counsel for respondent made an oral motion that the court dismiss the charges upon the ground that the court had no jurisdiction to proceed with the hearing (R. 11). The motion at that time was overruled, with permission to renew it at the conclusion of all the testimony. Such motion was so renewed, both at the conclusion of the testimony offered by the committee (R. 1000), and at the conclusion of all the evidence (R. 1153).

The argument advanced by respondent was that the charges and specifications, assuming them to be true, do not constitute misconduct or unprofessional conduct involving moral turpitude.

### 1. JURISDICTION.

Jurisdiction of a court consists of three component parts: (a) Jurisdiction of the subject matter; (b) jurisdiction of the parties; and (c) jurisdiction to enforce its judgment.

In the instant case, jurisdiction of the subject matter is specifically conferred by the statute (§4705.02 R. C.).

Jurisdiction of the person clearly appears from the record. Respondent filed an answer and appeared in person and with counsel at the hearing.

Jurisdiction to enforce any judgment which the court may enter cannot be successfully challenged.

The conclusion is inescapable that this court has full and complete jurisdiction in this proceeding.

The question of whether the charges and specifications and the evidence adduced in support thereof constitute or establish misconduct or unprofessional conduct involving moral turpitude is the ultimate question to be decided. That question in no way involves the question of jurisdiction. Even though respondent's motion be considered as a general demurrer, it is not well taken. Hence, the motion to dismiss will be overruled.

## 2. INHERENT POWER.

The question of inherent power is unnecessary of decision in the instant case.

The court has carefully examined the case of **In re Thatcher, 80 Oh St 492,** wherein it was held (paragraphs one and two of the syllabus) that the courts of Ohio do have such inherent power. Likewise, we have considered **In re Hawke, 107 Oh St 341,** wherein it is stated in the opinion that the courts of Ohio have no such inherent power (pages 349 and 350). No question of inherent power was involved in the Hawke case.

The Hawke case was decided fourteen years after the Thatcher case, yet no mention of the Thatcher case was made in that case. The pronouncements in the Thatcher case have never been overruled, and in view of the facts that those pronouncements are found in the syllabus, and that the statement in the opinion in the Hawke case is pure obiter, we conclude that the Thatcher case is still the law of Ohio. However, the instant case was instituted, has been heard and is being decided as a proceeding under the statute.

## 3. RIGHT OF COMMITTEE TO CALL RESPONDENT AND PROCEED AS ON CROSS-EXAMINATION.

At the commencement of the hearing the court was confronted with the question of the right of the committee to call respondent and proceed as upon cross-examination.

This is a special statutory proceeding, which is neither a civil action nor a criminal prosecution, but partakes of some of the attributes of each. It is the established law of this state that the statute is penal in its nature, must be strictly construed in favor of the accused, and that the evidence must be clear and convincing to establish guilt.

No Ohio case has been called to our attention wherein the question of the right of a committee to call a respondent in a disbarment proceeding and proceed as on cross-examination has been determined. The cases in other jurisdictions are not uniform, some courts have concluded that a proceeding

to disbar an attorney is a criminal prosecution, and others that it is a civil action.

Sec. 2317.07 R. C. (§11497 GC) reads in part as follows:

"At the instance of the adverse party, a party may be examined as if under cross-examination, orally, by way of deposition, like any other witness * * *."

That section supersedes the common-law action known as a bill of discovery. (In re Berger, 13 Oh Ap 206, affirmed, 101 Oh St 512.)

The section permits the calling of the adverse party to elicit facts within the knowledge of the party called, and unknown to the party calling the witness, essential to make out a cause of action or a defense. (See In re Schoepf, 74 Oh St 1, at page 14.)

We think that the committee had no right to call and examine respondent as if under cross-examination. There were no facts unknown to the committee, which were elements essential to making out a case.

#### 4. DEPOSITIONS.

Respondent asserts that the testimony contained in the depositions is not competent. The committee asserts that the court has heretofore decided that question when it granted permission to take such depositions. With the contention of the committee the court does not agree. True, the court granted permission to take depositions, but we have been unable to find anything in the record to indicate that the court has heretofore passed upon the question of the admissibility of the testimony contained therein. The right to take depositions is granted by the statute. and is not dependent upon permission of the court. The right to take depositions should be carefully distinguished from the right to read the testimony contained therein at the trial. (See In re Raug, 65 Oh St 128, and Gorman, Admx, v. The Columbus & Southern Ohio Electric Co., 144 Oh St, 593.) The question of the admissibility of testimony arises only when the testimony is offered, regardless of whether such testimony is oral, by affidavit, or by deposition,

It is the contention of the respondent that this is not an adversary proceeding—that there is no adverse party.

Sec. 2319.15 R. C., reads in part as follows:

"Written notice of the intention to take a deposition shall be given to the adverse party * * *." (Emphasis supplied.)

Upon this point the position of respondent is, to say the least, not consistent. At a preliminary hearing held in February, 1954, the respondent complained that he had not been notified that the court had appointed two investigators to

assist the committee. The respondent, by his counsel, then argued that the proceeding was an adversary proceeding. The record further discloses that respondent was first to invoke the statute authorizing the taking of depositions, and he served the committee as the adverse party.

The term, "adverse party," has a legal signification, and it must be presumed that the General Assembly, in the enactment of §2319.15 R. C., and numerous other sections wherein the term, "adverse party," is used, had in mind the legal meaning of the term.

The term "adverse party" embraces any party whose personal, property, or other rights may be adversely affected by the operation of the judgment or final relief sought in a legal proceeding. The caption of the proceeding is in no way controlling. (See 2 Words and Phrases [Permanent Ed.], 549 et seq., and numerous cases cited.)

Surely it cannot be seriously contended that the personal, property, or other rights of the respondent may not be adversely affected by the judgment in this proceeding.

We conclude that upon the filing of the charges, the committee and respondent became adverse parties.

Sec. 2319.29 R. C., provides:

"**No exception to a deposition other than for incompetency or irrelevancy shall be regarded unless it is made and filed before the commencement of the trial.**" (Emphasis supplied.)

The respondent failed to file any objection to the taking of the depositions, and also failed to file any exceptions in writing to the depositions prior to the trial. If, as he now claims, the depositions were not legally taken and could not be read in evidence, it was his duty, under the statute, to file his exceptions in writing before the commencement of the trial. His objection was not to the competency or relevancy of the testimony contained in the depositions, but to the legality of their taking.

We adhere to the ruling that it was proper to receive the competent and material testimony contained in the depositions.

We come now to a consideration of the evidence. No useful purpose would be served, and this opinion would be unduly lengthened by the setting forth of each of the twenty-two specifications filed in connection with the charges, and the testimony as it applies to each specification. The court will content itself with a narrative form statement of what the testimony clearly and convincingly establishes.

Respondent, Alex S. Dombey, was admitted to the bar of Ohio in 1929, and took the then existing oath as an attorney

at law. He began to practice law in the city of Columbus, and until 1951 no official complaint was made of his conduct. In 1947 he was retained as attorney for the Legislative Co-operation Committee for the Transportation Brotherhoods, with a membership of about seventy thousand men employed by various railroads. Thereafter he devoted almost his entire time to the work of the committee and the handling of railroad accident cases. That he was eminently successful in that line of endeavor is best attested by the fact that from 1948 to 1952, inclusive, he recovered from the railroads, for injured workmen and the families of workmen accidentally killed in railroad accidents, approximately two and one-half million dollars. He acquired many satisfied and enthusiastic clients.

In September 1947, Darwin E. Bennett (R. 120 et seq.) a man employed in the transportation department of the Pennsylvania Railroad was injured, and later that year he employed respondent to represent him in connection with that injury. During the pendency of Bennett's claim against the railroad, and until the settlement of the case in 1948, respondent loaned Bennett considerable sums of money. During that time Bennett and respondent had some conversation with regard to solicitation of personal injury cases, at which time respondent told Bennett that, if he knew of any cases which he could get for respondent, he (Bennett) would be well taken care of. Bennett testified that later, while he and respondent were in Pittsburg, Pennsylvania, to see one Rogers, an injured railroad employee whom Bennett had solicited for respondent, it was agreed between Bennett and respondent that he (Bennett) was to receive a sum equal to five per cent of the recovery in each case he solicited.

Bennett's first solicitation for respondent was the Rogers case. Respondent also paid the expenses of another man, named Moody, in an effort to secure the Rogers case. In his endeavor to secure the Rogers case Bennett made trips to a hospital in Steubenville, Ohio, and to Rogers' home in Pittsburg, Pennsylvania. Rogers finally said that he would like to talk to respondent. The next day Bennett and respondent appeared at the home of Rogers in Pittsburg, Pennsylvania, and at that time and place respondent secured a contract of employment from Rogers, and advanced him one thousand dollars for living expenses, at the same time giving to Bennett a check for three hundred dollars.

The Rogers case is typical of the method employed between Bennett and respondent.

Bennett solicited numerous cases between the time of the Rogers case and 1951, when he and respondent had some dis-

pute, Bennett claiming that respondent owed him a large sum of money over the amount of several hundred dollars which he had received. That dispute led to Bennett's visit to the chairman of the Grievance Committee of the Bar Association in 1951.

In 1949 one George F. Wolcott (R. 533 et seq.) employed in the transportation department of the New York Central Railroad was injured. He employed Carl Gugler, an attorney practicing in Galion, Ohio, to represent him. Wolcott became dissatisfied with Gugler's services and went to see respondent, who told him that he (respondent) could not act in the case as long as Gugler was Wolcott's attorney. After some conversation between Wolcott and respondent with reference to certain indebtedness due to Gugler from Wolcott, respondent advanced Wolcott the sum of five hundred dollars to pay the said debt, in order that Wolcott could employ respondent. This loan, according to Wolcott's testimony, was made prior to the signing of any contract of employment between Wolcott and respondent.

During the pendency of that claim respondent advanced to Wolcott substantial sums of money and told him (Wolcott) that he could make a little extra money by talking to railroad friends who received injuries, and referring such cases to respondent. Wolcott proceeded to solicit numerous cases for respondent, and was paid varying amounts, totaling about seven hundred dollars.

In 1951 Wolcott moved to Omaha, Nebraska, and respondent told him to be sure and let him (respondent) know where he (Wolcott) was, in order that payment could be made on some of the business that Wolcott had brought in. Wolcott returned to Ohio in 1953, and called on respondent, saying that he was short one hundred dollars of having enough money to pay the trucking company for hauling his furniture back to Ohio. Respondent furnished the amount requested. Later Wolcott made a demand on respondent for money which he claimed was due him for solicitation of business. His inability to see respondent after the one hundred-dollar transaction, caused him in 1953, to make a sworn statement to the Grievance Committee of the Bar Association.

We have reviewed the testimony of Bennett and Wolcott in considerable detail, with a two-fold purpose. The complaints of these two men were the original source of the Bar Association's action, and their testimony clearly discloses a course of conduct on the part of respondent in securing a large number of cases, which course of conduct continued for several years.

The record contains the testimony of numerous other in-

jured persons who were solicited, some by paid solicitors. to employ respondent to represent them. Some of those solicited did, and some did not employ him.

After the complaints by Bennett and Wolcott to the Grievance Committee, on October 1, 1953 respondent voluntarily appeared before that committee and made a statement (R. 963). In that statement respondent admitted paying money to Moody, Bennett and Wolcott, and to others in cases in which each, respectively, had a part in securing the injured person to employ respondent. It was stated by respondent at that time that the money was paid for investigational work. After hearing the testimony of Bennett and Wolcott, together with the large array of other witnesses offered by the committee, the respondent rested his defense without taking the witness stand. Hence, the testimony as to solicitation offered by the committee at the hearing stands uncontradicted.

The court finds that the respondent was obtaining legal business through paid solicitors, and that course of conduct covered a period of at least three or four years.

The final and ultimate legal question to be resolved is whether or not solicitation of legal business through paid solicitors amounts to misconduct or unprofessional conduct involving moral turpitude.

There can be little dispute upon the proposition that solicitation of legal business through paid solicitors amounts to unprofessional conduct. Does it involve "moral turpitude"?

The statute does not define "moral turpitude," and the term is almost impossible of exact definition. The phrase, "moral turpitude," has been defined many times by courts, and often the definitions have been more confusing than enlightening.

The case against the respondent is built upon the proposition that solicitation of legal business by an attorney through paid solicitors amounts to misconduct or unprofessional conduct involving moral turpitude. That position is vigorously assailed by respondent. He contends that his course of conduct as shown by the evidence does not involve moral turpitude.

In this state the Supreme Court has exclusive power to admit persons to the practice of law. The General Assembly has recognized that power by the passage of §§4705.01, 4705.07 and 4705.99 R. C.

The power to promulgate and enforce rules of conduct is a necessary incident to the power to admit; if that were not true, then the courts would have no control over their own officers, and the practice of the law would cease to be a profession and become purely a competitive enterprise.

In the exercise of such power, the Supreme Court adopted

rules of professional conduct. We are concerned with Rule XXVIII, which reads in part as follows:

"SECTION 1. These rules of professional conduct shall be binding upon all members admitted to practice law in the State of Ohio, and the wilful breach thereof shall be punished by reprimand, by suspension or by disbarment, as may be determined by any court of competent jurisdiction.

"The Canons of Ethics of the American Bar Association are commended; and nothing in these rules is intended to limit or supersede any provision of law relating to the duties and obligations of attorneys or the consequences of a violation thereof.

"SECTION 2. **An attorney at law shall not advertise or otherwise solicit professional employment.** This rule shall not apply to the publication or use of ordinary professional cards or conventional listings in legal directories and newspapers.

"SECTION 3. **An attorney at law shall not employ another to solicit or to obtain or remunerate another for soliciting or obtaining professional employment for him.**" (Emphasis supplied.)

There can be no question that respondent has wilfully and consistently violated that rule for a long period of time.

This case is reduced to the simple question: Does a wilful and persistent violation of Rule XXVIII constitute moral turpitude?

The phrase, "moral turpitude," is found in many federal and state statutes. As used in the Federal Deportation Statute that phrase has been given one meaning; as used in connection with criminal acts another meaning; and as used in disbarment proceedings a third meaning. (See 27 Words and Phrases [Permanent Ed.], 554 et seq., and cases cited; Bouvier's Law Dictionary.)

There is a vast difference between securing business through the influence and efforts of friends, and securing it through the methods employed by the strictly commercial enterprise of hired agents.

There is also a difference between the unprofessional and undignified practice of personal solicitation of business and the indefensible and vicious practice of employing agents or runners to go about soliciting business. Some cases hold that personal solicitation, while unprofessional and undignified, does not involve moral turpitude; others hold to the contrary. However, the decisions throughout the country are practically uniform in condemning paid solicitation and disciplining the attorney involved. (See Smith v. State Bar of California, 211

Cal., 249; People, ex rel Chicago Bar Association, v. Berezniak, 292 Ill., 305; Chreste v. Commonwealth, 171 Ky., 77; In re Sizer, 306 Mo., 356; **In re Thatcher, 80 Oh St 492;** Maires' Appeal, 189 Pa., 99; State v. Kiefer, 197 Wis., 524; **In re Jacoby, 74 Oh Ap 147; In re Meck, 51 Oh Ap 237;** In re Veach, 1 Ill. (2d), 264, 115 N. E. (2d) 257; Louisville Bar Assn. v. Mazin, 282 Ky., 743, 139 S. W. (2d), 771; In re Greathouse, 189 Minn., 51, 248 N W. 735; State, ex rel Sorensen, v. Goldman, 127 Neb., 340, 255 N. W. 32; In re Durham, 190 Okl., 588, 126 P. (2d), 69; In re Gorsuch, 113 Kan., 380, and 214 P. 794.

Rule XXVIII prohibits solicitation, and where an attorney disobeys a rule of the Supreme Court fixing the standard of professional conduct, and such disobedience is wilful and persistent over a long period of time, such course of conduct involves moral turpitude. (See Townsend v. State Bar of California, 210 Cal., 362; In re Attorneys of Sanitary District of Chicago, 351 Ill., 206.)

The evidence in the instant case is clear and convincing that respondent has been guilty of unprofessional conduct involving moral turpitude in two respects: (a) By solicitation of personal injury cases by and through paid solicitors; and (b) by respondent's payment to Wolcott of five hundred dollars to get another attorney discharged from a case in order that respondent could be employed.

The last question to be answered is: What penalty is warranted under the facts?

The statute provides that the court shall take "such action as is warranted." Rule XXVIII and the statute provide for punishment by "reprimand, by suspension or by disbarment."

In determining the question of punishment the court has taken into consideration: That this record fails to disclose any interference or attempt to interfere with the due administration of justise; that respondent was not dishonest in his dealings with any of his clients; that respondent has never tampered with a witness in any cause; and that from 1929 until 1951 respondent's conduct as an attorney was never officially questioned.

We believe that the facts do not justify the disbarment of respondent, but do warrant his suspension from the practice for the period of one year from August 1, 1954, until July 31, 1955.

An entry may be drawn accordingly.

BAUMANN, J., of Sandusky County and FORD, J., of Mahoning County, concur.