SHIMKO, APPELLANT, v. LOBE ET AL., APPELLEES, ET AL.

[Cite as *Shimko v. Lobe*, 103 Ohio St.3d 59, 2004-Ohio-4202.]

(No. 2003–1017—Submitted April 28, 2004, at the Clermont County Session—Decided August 25, 2004.)

---

ALICE ROBIE RESNICK, J.

{¶ 1} This is an appeal from a judgment upholding the constitutionality of DR 2–107(B), which requires that disputes over the division of fees between lawyers who are not in the same firm be resolved in accordance with mediation or arbitration proceedings provided by a local bar association or, when necessary, by the Ohio State Bar Association.

{¶ 2} The cause emanates from a dispute between plaintiff-appellant, Timothy A. Shimko, and defendant-appellee Thomas G. Lobe, both of whom are admitted

to practice law in Ohio. The dispute centers on the terms of an oral agreement with regard to the division of legal fees for litigation in California.

{¶ 3} On September 19, 1995, Lobe wrote to defendant-appellee Cleveland Bar Association ("CBA"), requesting that the dispute be "set down for mandatory and binding Arbitration." Lobe's request was made pursuant to the Bylaws and Rules of the Division of Fees Mediation and Arbitration Committee, which were adopted by the CBA's Board of Trustees on September 25, 1992, to implement DR 2–107(B). Under the committee's bylaws, "any decision rendered by a sole arbitrator or an arbitration panel is final and binding."

{¶ 4} In a letter dated September 29, 1995, Shimko opposed Lobe's request for arbitration on the grounds that Lobe had failed to allege sufficient facts to invoke the committee's jurisdiction. On December 8, 1995, the committee's secretary notified the parties that the committee was accepting jurisdiction and recommended that Lobe file the requisite petition. Lobe then submitted a formal petition for arbitration.

{¶ 5} Shimko commenced this action in 1996 by filing the first of two complaints for declaratory judgment in the Franklin County Court of Common Pleas against Lobe, CBA, and defendant-appellee Ohio State Bar Association ("OSBA") (case No. 96CVH02–1206). In that complaint, Shimko sought a declaration that DR 2–107(B) violates several provisions of the Ohio and United States Constitutions and, therefore, is invalid and unenforceable. Finding that "[t]he practice of law is a privilege granted by the Supreme Court to those persons * * * who agree to be bound by the rules of the profession" and that the "regulation of * * * fee disputes is a proper function of the Court in its superintendence of the Bar," the trial court held that DR 2–107(B) "does not violate the Plaintiff's rights existing under the Constitutions of the State of Ohio and the United States."

{¶ 6} The court of appeals affirmed the trial court's judgment, except to the extent that it had decided the issue of whether DR 2–107(B) deprives Shimko of his right to a jury trial as guaranteed by Section 5, Article I of the Ohio Constitution without having made a factual determination of reasonableness. Espousing the proposition that " '[n]o one has an absolute right to practice law, and the State may impose reasonable conditions and limitations upon those who wish to exercise that privilege,' " the majority of the court of appeals framed the determinative inquiry under Section 5, Article I in terms of whether DR 2–107(B) "is reasonable and, therefore, appellant should be bound by it." *Shimko v. Lobe* (1997), 124 Ohio App.3d 336, 347, 706 N.E.2d 354, quoting *Kelley Drye & Warren v. Murray Industries, Inc.* (D.N.J.1985), 623 F.Supp. 522, 527. The appellate court believed, however, that it needed a "factual basis to assess the reasonableness of this rule" and, in accordance with that belief, remanded the cause to the

trial court "for a hearing to determine the reasonableness of the rule in * * * eliminating appellant's right to a jury trial." Id. at 347–348, 706 N.E.2d 354.

{¶ 7} On February 20, 1998, Shimko's cross-appeal to this court was dismissed for failure of prosecution. (1998), 81 Ohio St.3d 1450, 690 N.E.2d 545. On April 1, 1998, this court refused to accept appellees' discretionary appeal. (1998), 81 Ohio St.3d 1502, 691 N.E.2d 1061. Shimko then dismissed his original action pursuant to Civ.R. 41(A).

{¶ 8} Shimko refiled his complaint on April 5, 1999. The second complaint (case No. 99CVH04–2793) essentially duplicated the first, with the addition of two new claims not involved in this appeal.

{¶ 9} On April 17 and 18, 2000, an evidentiary hearing was held before a magistrate in accordance with the earlier mandate from the court of appeals to determine the reasonableness of DR 2–107(B). In a decision filed September 13, 2000, the magistrate concluded that "DR 2–107(B) is a reasonable restriction on the practice of law, and therefore constitutional." In so doing, the magistrate found that in compelling arbitration of fee disputes between lawyers, the rule serves to prevent the erosion of public confidence in the legal profession, particularly by "avoiding what many perceive as the tawdry spectacle of lawyers fighting over the carcass of a fee" and "helps to preserve the confidentiality of attorney-client communication and to preserve privileges."

{¶ 10} In a decision dated August 13, 2001, the trial court adopted the magistrate's decision over Shimko's objections, with one minor modification as to a finding of fact.

{¶ 11} On Shimko's appeal, the court of appeals affirmed all aspects of the trial court's various rulings, concluding that "[b]ased on the evidence presented at the [April 17, 2000] hearing * * * the compulsory arbitration and mediation provision of [DR 2–107(B) ] is a reasonable restriction on those who practice law in Ohio." 152 Ohio App.3d 742, 2003-Ohio-2200, 790 N.E.2d 335, ¶ 32. Moreover, the court of appeals found that "attorneys admitted to the practice of law in Ohio, including [Shimko], agree to have a 'dispute between lawyers arising under this rule' submitted to mediation or arbitration. By doing so, they have waived the right to a jury trial in [cases involving such] fee disputes." Id. The court also held that by providing for mediation or arbitration through bar associations, "[t]he Supreme Court has not unlawfully delegated judicial authority to resolve [such] fee disputes," since the lawyer's consent upon admission "to be bound [by] the Code of Professional Responsibility, including DR 2–107(B)'s provisions * * * gives the mediators or arbitrators their authority to resolve the fee disputes."

{¶ 12} The cause is now before this court pursuant to the acceptance of a discretionary appeal.

{¶ 13} In this appeal, Shimko proposes that DR 2–107(B) is unconstitutional for two reasons: (1) it denies attorneys the right to a jury trial as guaranteed by Section 5, Article I of the Ohio Constitution, and (2) it creates or delegates the power to create tribunals unauthorized by law.

{¶ 14} For the reasons that follow, we reject both these propositions and hold that DR 2–107(B) is a lawful exercise of this court's inherent and plenary power to regulate, control, and define the practice of law in Ohio.

## I

## RIGHT OF TRIAL BY JURY

{¶ 15} Beginning with the adoption of Supreme Court Rule XXVI in February 1875, see 24 Ohio St. V, and culminating in the adoption of Section 2(B)(1)(g), Article IV of the Ohio Constitution in 1968, it has been methodically and firmly established that the power and responsibility to admit and discipline persons admitted to the practice of law, to promulgate and enforce professional standards and rules of conduct, and to otherwise broadly regulate, control, and define the procedure and practice of law in Ohio rests inherently, originally, and exclusively in the Supreme Court of Ohio. See *Smith v. Kates* (1976), 46 Ohio St.2d 263, 265–266, 75 O.O.2d 318, 348 N.E.2d 320; *Mahoning Cty. Bar Assn. v. Franko* (1958), 168 Ohio St. 17, 5 O.O.2d 282, 151 N.E.2d 17; *Cleveland Bar Assn. v. Pleasant* (1958), 167 Ohio St. 325, 4 O.O.2d 433, 148 N.E.2d 493; *In re McBride* (1956), 164 Ohio St. 419, 58 O.O. 242, 132 N.E.2d 113; *Judd v. City Trust & Sav. Bank* (1937), 133 Ohio St. 81, 10 O.O. 95, 12 N.E.2d 288, paragraph one of the syllabus; *In re Thatcher* (1909), 80 Ohio St. 492, 89 N.E. 39; Swisher, Professional Responsibility in Ohio (1981) 1.15–1.35.

{¶ 16} In exercising its supervisory responsibility over the bar, this court has sought to maintain the integrity of the legal profession and preserve the public confidence in the judicial system. See, e.g., EC 1–1, 9–1, and 9–6. See, also, *Franko,* supra, 168 Ohio St. at 23, 5 O.O.2d 282, 151 N.E.2d 17; *In re Disbarment of Thatcher* (1910), 83 Ohio St. 246, 249, 93 N.E. 895. Thus, while recognizing that "[t]he legal profession cannot remain a viable force in fulfilling its role in our society unless its members receive adequate compensation for services rendered," EC 2–15, the Code of Professional Responsibility contains a broad range of rules that limit the attorney's pursuit of legal fees. See, e.g., DR 2–101(E)(1) and (2) (specifying allowable and binding advertisement with regard to fees), DR 2–103 (general prohibition and exceptions concerning payment of referral fee), DR 2–106(A) and (B) (precluding lawyers from collecting an illegal or clearly excessive fee and providing standards for determining when a fee is clearly excessive), DR 2–106(C) (prohibiting contingent fees in criminal cases), DR 2–110(A)(3) (requiring a lawyer, upon withdrawing from employment, to

refund any fees that were paid in advance), DR 3–102(A) (prohibiting a lawyer from sharing legal fees with a nonlawyer), DR 5–103(A) (prohibiting acquisition of proprietary interest in litigation, except a lien to secure payment of fees and a contingency fee in civil cases), and DR 5–107(A) (precluding a lawyer from accepting third-party compensation without the client's consent after full disclosure).

{¶ 17} To this end, DR 2–107 provides:

{¶ 18} "(A) Division of fees by lawyers who are not in the same firm may be made only with the prior consent of the client and if all of the following apply:

{¶ 19} "(1) The division is in proportion to the services performed by each lawyer or, if by written agreement with the client, all lawyers assume responsibility for the representation;

{¶ 20} "(2) The terms of the division and the identity of all lawyers sharing in the fee are disclosed in writing to the client;

{¶ 21} "(3) The total fee is reasonable.

{¶ 22} "(B) In cases of dispute between lawyers arising under this rule, fees shall be divided in accordance with mediation or arbitration provided by a local bar association. Disputes that cannot be resolved by a local bar association shall be referred to the Ohio State Bar Association for mediation or arbitration."

{¶ 23} Gov.Bar R. IV(1) provides:

{¶ 24} "The Code of Professional Responsibility, as adopted by this Court on October 5, 1970 and set forth in 23 Ohio State 2d Reports, as amended, shall be binding upon all persons admitted to practice law in Ohio. The willful breach of the Code shall be punished by reprimand, suspension, disbarment, or probation as provided in Gov.Bar R. V." See, also, Gov.Bar R. I(8)(A) (requiring each applicant, upon admission to the bar, to take an oath to "abide by the Code of Professional Responsibility").

{¶ 25} The court of appeals expressed some doubt, however, as to the finality of an arbitration award rendered pursuant to DR 2–107(B). In its 1997 decision, the court of appeals timorously noted, "Although the rule itself does not state that arbitration before the Ohio State Bar Association is either 'final' or 'binding,' the Ohio State Bar Association DR 2–107 Attorney's Fee Division Dispute Resolution Plan, adopted by the Council of Delegates on November 9, 1991, expressly states that such arbitration is 'binding.' " *Shimko*, supra, 124 Ohio App.3d at 346, 706 N.E.2d 354, fn. 4.

{¶ 26} Considering that DR 2–107(B) explicitly requires division of fees "in accordance with mediation or arbitration," that "[t]he Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character" (Preface to Code of Professional Responsibility), and that the salient purpose of the rule is to prevent

litigation of disputes between lawyers over the division of fees, it is clear that DR 2–107(B) cannot and was not intended to be interpreted otherwise. Lest there be any further uncertainty, we hold that an arbitration award rendered pursuant to DR 2–107(B) is final, binding upon the parties, and unappealable. In this way, the burden of withstanding constitutional scrutiny under Section 5, Article I will fall upon the rule itself, as adopted by this court, rather than being foisted upon the implementing plans or bylaws of a particular bar association.

{¶ 27} Shimko correctly asserts that the court's power to regulate the bar "is not absolute and [that] it must be contained by, and act congruently with, the very constitution that provides for its existence." This court may no more disregard or infringe upon the constitutional rights of our citizens in the exercise of its regulatory functions than may any other branch of government. As we explained in *Christensen v. Bd. of Commrs. on Grievances & Discipline* (1991), 61 Ohio St.3d 534, 537, 575 N.E.2d 790, "Rules adopted by this court in an administrative capacity must comply with the state and federal constitutions like any other rules and may be tested in any court of competent jurisdiction."

{¶ 28} In particular, the court does not enjoy any special exemption from compliance with Section 5, Article I of the Ohio Constitution, which ensures that "[t]he right of trial by jury shall be inviolate * * *." We have consistently recognized that Section 5, Article I does not merely extol a procedural privilege, but secures a sacred and fundamental right, anchored in the founding of our nation and state and basic to the institution of American democracy, that may not be invaded or violated by legislative act or judicial order or decree. See, e.g., *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 421, 633 N.E.2d 504; *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 701, 702–703, 576 N.E.2d 765 (A. W. Sweeney, J., concurring in part and dissenting in part); *Miller v. Wikel Mfg. Co., Inc.* (1989), 46 Ohio St.3d 76, 81, 545 N.E.2d 76 (Douglas, J., concurring in part and dissenting in part).

{¶ 29} But the right of trial by jury under Section 5, Article I is still a qualified right. "It was not * * * the intention of the framers of that clause * * * to guarantee the right of trial by jury in all controversies. That guaranty only preserves the right of trial by jury in cases where under the principles of the common law it existed previously to the adoption of the [Ohio] Constitution. The right of trial by jury has uniformly been recognized and enforced in this state in actions for money, where the claim is an ordinary debt * * *." *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 396–397, 169 N.E. 301. See, also, *Sorrell,* supra, 69 Ohio St.3d at 421, 633 N.E.2d 504; *Kneisley v. Lattimer–Stevens Co.* (1988), 40 Ohio St.3d 354, 356, 533 N.E.2d 743. The right, where it exists, may also be waived. "Section 5 of Article I of the Ohio Constitution does not prevent a court from giving effect to a waiver of a jury trial by a party who has a right to

a jury trial." *Cassidy v. Glossip* (1967), 12 Ohio St.2d 17, 41 O.O.2d 153, 231 N.E.2d 64, paragraph one of the syllabus. See, also, *Bonewitz v. Bonewitz* (1893), 50 Ohio St. 373, 34 N.E. 332, paragraph one of the syllabus ("A party may waive his right to a jury trial by acts, as well as by words").

{¶ 30} This court has never considered the constitutionality of DR 2–107(B). The rule was challenged on several constitutional grounds in *State ex rel. Lawrence v. Marks* (1995), 74 Ohio St.3d 1207, 655 N.E.2d 1308, and the concurring justices in that case opined that "a legitimate question arises [under Section 5, Article I] whether this court, by rule or otherwise, can force parties in an attorney-fee dispute to arbitrate when the result of a true arbitration is an award which is final and nonappealable and the parties have not previously agreed to arbitrate." Id. at 1208, 655 N.E.2d 1308 (Douglas, J., concurring). However, the majority of the court refrained from commenting on the merits in that action, which was unanimously dismissed upon motion for lack of jurisdiction.

{¶ 31} As far as we can ascertain, no other court has considered the constitutional validity of a disciplinary or other court rule compelling arbitration of fee disputes between attorneys. However, several courts have been confronted with a variety of constitutional objections to court rules that require arbitration of attorney-client fee disputes at the client's option. In each case, the rule was upheld against all challenges, including those based upon the right to a jury trial.

{¶ 32} *In re LiVolsi* (1981), 85 N.J. 576, 428 A.2d 1268, involved a number of challenges to N.J.R. 1:20A, which was adopted by the New Jersey Supreme Court as a mechanism for resolving fee disputes between attorneys and their clients. The rule establishes fee-arbitration committees and provides that a committee must arbitrate a dispute upon the request of a client, whether the attorney consents or not, and that the committee's determination is binding on the parties and unappealable. In finding the promulgation of N.J.R. 1:20A to be within the scope of its constitutional power, the Supreme Court of New Jersey explained:

{¶ 33} "The heart of the constitutional provisions concerning the judicial system was the concentration of responsibility for its proper functioning in the Supreme Court and Chief Justice. Such responsibility requires appropriate power over courts, judges, practice and procedure, and lawyers. Responsibility for an adversarial judicial system requires responsibility for the adversaries, and control over both.

{¶ 34} "In exercising this responsibility, one of the many goals this Court has sought to achieve has been maintaining public confidence in the judicial system. * * *

{¶ 35} "Given the critical importance of the constitutional power of this Court over the practice of law, and its pervasiveness, starting with admission, ending

with disbarment, and covering everything in between, we have no doubt that the power extends to every aspect of fee agreements between lawyers and clients." Id., 85 N.J. at 585, 428 A.2d 1268.

{¶ 36} The court went on to reject the claim that N.J.R. 1:20A unconstitutionally denies attorneys the right to trial by jury "on the two grounds that in New Jersey attorneys never had an absolute right to trial by jury in fee dispute cases and that recognizing a jury right in such cases would undermine our constitutional authority to regulate the Bar." Id. at 587, 428 A.2d 1268.

{¶ 37} After *In re LiVolsi* was decided, the New Jersey rule was twice challenged and upheld in federal court under the jury-trial clause of the Seventh Amendment to the United States Constitution. In *Kelley Drye & Warren v. Murray Indus., Inc.* (D.N.J.1985), 623 F.Supp. 522, 526–527, and again in *Guralnick v. Supreme Court of New Jersey* (D.N.J.1990), 747 F.Supp. 1109, 1116, affirmed (C.A.3, 1992), 961 F.2d 209, it was held that state courts may, consistent with the Seventh Amendment, require persons wishing to exercise the privilege of practicing law to waive or forfeit their right to a jury trial if the client elects to arbitrate a fee dispute.

{¶ 38} In *Anderson v. Elliott* (Me.1989), 555 A.2d 1042, the Supreme Judicial Court of Maine held that certain Maine Bar Rules promulgated by the court in 1978 do not infringe upon an attorney's right to trial by jury under the Maine Constitution. The court explained that "Rule 9 establishes a mechanism for binding arbitration of attorney-client fee disputes under the jurisdiction of the Board of Overseers of the Bar, and Rule 3.3(c) obligates an attorney to submit any fee dispute to Rule 9 arbitration at the client's request." Id. at 1043.

{¶ 39} At the outset of its analysis, the Maine Supreme Court recognized:

{¶ 40} "Maine Bar Rule 9 enables a client to prevent his attorney from having their fee dispute heard by a jury, but that by itself does not violate the constitutional guarantee of the right to a civil jury trial, Me. Const. art. I, § 20. Elliott's thesis that a suit to recover a contingent fee is just like any other suit for money damages for breach of contract—in other words, that the attorney-client relationship is just like any other contractual arrangement—ignores the uniqueness of the attorney's relation to the court and to the client." Id. at 1047.

{¶ 41} Upon taking the oath of office, the court explained, "the attorney enters into a regulated profession and becomes an officer of the court subject to the court's inherent power," which necessarily includes the imposition of " 'certain standards peculiarly applicable to attorneys * * * to assure fairness and efficiency of court procedures and adjudications and to foster public confidence in such fairness and efficiency.' " Id., 555 A.2d at 1048, quoting *In re Dineen* (Me.1977), 380 A.2d 603, 604. Thus, continued the court, "an attorney-client fee dispute is no ordinary contractual controversy. Members of the public as a practical matter

have access to the courts only through their attorneys, and that access is impaired by collateral controversies over legal charges." Id. at 1049. See, also, *Nodvin v. State Bar of Georgia* (2001), 273 Ga. 559, 561, 544 S.E.2d 142 (recognizing the "unique * * * importance" of public confidence in the judicial system as justification for mandatory arbitration of attorney-client fee disputes).

{¶ 42} One of Shimko's principal contentions is that *LiVolsi* and *Anderson* are distinguishable because they involve attorney-client fee disputes rather than disputes between attorneys. According to Shimko, "the nature of the relationship between the attorney and client was critical to each of those courts." In particular, Shimko contends that because "the attorney occupies a fiduciary relationship, with a position of superiority over the client * * *, the Supreme Courts of Maine and New Jersey felt it was reasonable for attorneys to submit to non-jury adjudications for fee disputes." On the other hand, the argument continues, attorneys like Shimko and Lobe need no special protection from one another, as they stand "on equal footing and at arms-length, and neither would be hindered or put to a disadvantage by taking the dispute to court." We disagree.

{¶ 43} Shimko's argument is built on the erroneous premise that the constitutional validity of the nonjury dispute-resolution mechanisms at issue in *LiVolsi* and *Anderson* was necessarily dependent upon concerns peculiar to the attorney-client relationship. However, a close reading reveals that the critical support for the constitutionality of the compulsory arbitration schemes in those cases was ultimately found to lie not in the fiduciary character of the attorney-client relationship or the attorney's position of dominance over the client, but in the relations existing between the bench and bar, that is, in the recognition that lawyers are officers of the court and essential to the primary judicial function of administering justice. The essential power to control or regulate the fee arrangement between attorney and client is not derived from the attorney's position in relation to the client, but from the attorney's position in relation to the court and the justice system. Moreover, Shimko forgets that the courts in *LiVolsi* and *Anderson* did not purport to exercise any authority or control over the client. It was the attorney who was held in those cases to have entered a regulated profession and who was subjected to professional standards designed to preserve public confidence in the judicial system. In fact, the very rules at issue in *LiVolsi* and *Anderson* are expressly designed to operate at the client's option, thus disclaiming any ability or desire on the court's part to compel the client to arbitrate a fee dispute. And because those decisions reflect the court's broad power to regulate the professional activities of its officers, they are indeed significant to the matter at hand.

{¶ 44} Shimko also maintains that "[s]tatutes and rules that interfere with the right to a trial by jury are subject to the highest level of judicial scrutiny" and

that DR 2–107(B) is not "necessary to promote a compelling governmental interest." According to Shimko, the rationale advanced to support the rule, which Shimko states to be that "citizens will gain confidence in the legal system by not viewing lawyers litigat[ing] over legal fees," does not rise to the level of a compelling state interest. In any event, Shimko argues, no evidence was presented to suggest that the public is overly concerned with or affected by such litigation.

{¶ 45} Appellees argue, however, that these particular questions were resolved by the court of appeals in its 1997 decision, which became "the law of the case" upon this court's dismissal of Shimko's cross-appeal on February 20, 1998. Thus, appellees contend that Shimko should be precluded from relitigating the applicability of a reasonableness standard and, correlatively, that this court should limit its review to whether sufficient evidence was presented at the hearing on remand to support the finding that DR 2–107(B) is a reasonable restriction on the practice of law.

{¶ 46} We cannot agree with appellees that the "law of the case doctrine" has any applicability in this case. "The doctrine is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 462 N.E.2d 410. This court would be remiss in its supervisory responsibility over the bar if it were to apply the doctrine under the present circumstances. On the one hand, adherence to the doctrine in this appeal could result in this court's upholding an unconstitutional rule on account of being forced by the law of the case to apply the wrong analytic standard. On the other hand, it could result in this court's rendering a decision implying that these particular constitutional objections to DR 2–107(B) might be valid, only to postpone their resolution because a doctrine that we have chosen to apply prevents us from considering them.

{¶ 47} Having determined to address Shimko's contention that DR 2–107(B) fails to withstand strict scrutiny, we now reject it. In the first place, DR 2–107(B) does not implicate the right of trial by jury, because that right does not exist in cases of fee disputes between attorneys. Prior to 1802, the attorney's ability to recover a fee for legal services was regulated entirely by statute and rested for its authority upon the will of the legislature. Indeed, compensation for advocacy has never been treated as an ordinary debt or contractual right, but has since antiquity been regulated by the prevailing governmental authority possessing the power to control the practice of law.

{¶ 48} Both at Rome and in the ecclesiastical courts of England, "[t]he advocate * * * had no legal claim to a fee." Roscoe Pound, The Lawyer from Antiquity to Modern Times (1953) 68. Advocacy was considered "a service

gratuitously rendered for its own sake, for which the advocate might honorably accept a fair honorarium, voluntarily bestowed on him as a gift, but for which no bargain as to compensation and nothing in the way of hire was permissible." Id. at 54–55. On those rare occasions when fees were allowed, they were granted and strictly regulated by the prevailing governmental authority. Id. at 51–53.

{¶ 49} In colonial America, fees were strictly regulated by statute. Thus, Pound recounts:

{¶ 50} "In 1642–3, an Act for the Better Regulation of Attorneys forbade pleading causes for another without license from the court where one pleads * * *. Fees (in tobacco) were fixed very low with a heavy penalty for taking more. A licensed attorney was forbidden to refuse retainer unless already retained on the other side of the same controversy. * * * In 1657–58 it was enacted that no attorney and no other person should plead in any court or give counsel in any cause or controversy for any kind of reward or profit directly or indirectly, under penalty for every breach. However, fees were allowed and fixed by an Act of 1680, but no one was to practice in the General Court (formerly called Quarter Court) unless licensed by the Governor. * * * [S]tatutory regulation of fees [in Virginia] went on until 1849 * * *." Id. at 136–138. Also, "[i]n Maryland in 1725 there was a statute regulating fees strictly and allowing planters to pay ·in tobacco or in currency at a fixed rate." (Footnotes omitted.) Id. at 168.

{¶ 51} In the Northwest Territory, attorneys were permitted to charge and collect fees for their services, but that entitlement was derived from territorial legislation. On August 1, 1792, the territorial legislature passed "An ACT to regulate the admission of Attorneys." Pease Ed., Laws of the Northwest Territory (Ill.State Bar Assn.Reprint, 1925) 88. The Act of 1792 set forth qualifications for admission, required a successful applicant to take an oath of office, and provided that in no "cause shall fees for more than one attorney be taxed or allowed."

{¶ 52} The 1792 Act was repealed in 1795, id. at 255, 257, and replaced on October 29, 1799, with "An ACT regulating the admission and practice of attorneys and counsellors at law." Id. at 340. The Act of 1799 was considerably more structured and comprehensive than its predecessor and, as Swisher explains, "formed the model for succeeding legislation which was to govern the practice of law completely for the next century and more, and to govern at least some aspects of the practice of law into the second half of the 20th century." Swisher, at 1.5.

{¶ 53} The 1799 Act provided that no person shall be permitted to practice as an attorney at law in the territorial courts without having previously obtained a license from the governor, "which license * * * shall authorize him * * * to

demand, take and receive all such fees as are or hereafter may be established for any service which he shall or may do as an attorney at law in said territory." Act of 1799, Section 1. The Act also entitled the attorney, upon licensure, "to ask for and receive, or prosecute for or recover, all such fees as now are or hereafter may be allowed, by law, for services actually performed in his office, as attorney at law." Section 4. The Act further provided that every attorney "receiving money for the use of his client, and refusing to pay the same when demanded, may be proceeded against, in a summary way, on motion" and that any money or property received by an unlicensed person "as a fee or compensation for [legal] services rendered * * * may be recovered back, with costs of suit." Act of 1799, Sections 6 and 12.

{¶ 54} When the power over the practice of law was found to lie inherently in the judicial branch of government, this court firmly established that no person has a right to practice law, but that the practice of law is an extraordinary privilege bestowed by this court upon one who meets the qualifications for admission and continues to maintain the standard of ethical conduct as prescribed by the rules of the court. See *Franko,* supra, 168 Ohio St. at 22–24, 5 O.O.2d 282, 151 N.E.2d 17; *In re McBride,* supra, 164 Ohio St. at 426, 58 O.O. 242, 132 N.E.2d 113; *In re Thatcher,* supra, 80 Ohio St. at 653–655, 89 N.E. 39. See, also, *In re Thatcher* (N.D.Ohio 1911), 190 F. 969, 974–975. As one court stated, "The power to promulgate and enforce rules of conduct is a necessary incident to the power to admit; if that were not true, then the courts would have no control over their own officers, and the practice of the law would cease to be a profession and become purely a competitive enterprise." *In re Dombey* (C.P.1954), 68 Ohio Law Abs. 36, 45, 1954 WL 8029.

{¶ 55} Thus, virtually all aspects of the practice of law in general, and remuneration in particular, have always been considered to lie within the regulatory jurisdiction of the granting or admitting authority and to be distinct from other types of contractual arrangements. In fact, Shimko objects only to subsection B of DR 2–107. He does not deny this court's power to promulgate DR 2–107(A); that is, he does not dispute that the court has sole authority to determine whether and under what circumstances lawyers may properly divide fees with other lawyers in the first instance. But since this court has the inherent power to create or deny that right to its officers, it may provide for a procedure of enforcement that does not include a jury trial. See, e.g., *Hoops v. United Tel. Co.* (1990), 50 Ohio St.3d 97, 100, 553 N.E.2d 252. See, also, *Pleasant,* supra, 167 Ohio St. at 335, 4 O.O.2d 433, 148 N.E.2d 493.

{¶ 56} In any event, even if we agreed with Shimko that DR 2–107(B) must be subjected to "the highest level of judicial scrutiny," we would still conclude that it is supported by "a compelling governmental interest."

{¶ 57} In *Goldfarb v. Virginia State Bar* (1975), 421 U.S. 773, 792, 95 S.Ct. 2004, 44 L.Ed.2d 572, the United States Supreme Court recognized that "the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. * * * The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' "

{¶ 58} In *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, this court held that the Free Speech Clause of the Ohio Constitution, Section II, Article I, although broader than the federal Constitution in protecting certain false statements, does not forbid the imposition of discipline on an attorney for violating DR 8–102(B) by falsely accusing an appellate panel of judicial impropriety during a pending court proceeding. In that case, the court adopted an objective standard to determine whether a lawyer's statement about a judicial officer was made with knowledge or reckless disregard of its falsity, rather than the subjective "actual malice" standard applicable in defamation cases under *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. In so doing, we explained that DR 8–102(B) is designed "to preserve public confidence in the fairness and impartiality of our system of justice" and specifically concluded that "*the state's compelling interest in preserving public confidence in the judiciary* supports applying a standard in disciplinary proceedings different from that applicable in defamation cases." (Emphasis added.) Id., 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 29 and 31.

{¶ 59} DR 2–107(B) is also designed to preserve public confidence in our system of justice. As stated above, the rule is one of various Disciplinary Rules designed to allow for remuneration of legal services without compromising the integrity of the legal profession. But its goal is not to hide from the public that fee disputes do occasionally arise between lawyers. Public confidence in the judicial system is not enhanced by withholding the truth. Nor are fee disputes between lawyers a source of embarrassment for the profession, as honest and legitimate disputes over division of fees arise in any profession or service industry that charges fees. However, when the judicial machinery is used to resolve a simple fee dispute between lawyers, and when clients, perhaps exhausted by litigation, are once again summoned to court in a public battle between their attorneys, compelled to publicly reveal the terms of their fee arrangement and other secrets and confidences, then this court's failure to remedy that situation with a dignified and expedient dispute-resolution mechanism would directly reflect upon its ability to control the conduct of its officers, and the public confidence in the judiciary would most assuredly be affected.

{¶ 60} Contrary to Shimko's assertions (and to those of appellees and the court of appeals), identification and appraisal of the goals of DR 2–107(B) are not evidentiary questions. It is axiomatic that the constitutionality of administrative rules and regulations is a question of law. Otherwise, the facial validity of any particular rule "could be decided differently from case to case depending on the testimony of expert witnesses. A particular [rule] might then be found [invalid] in one case only to be applied in another pursuant to differing panels of experts." *Pinchot v. Charter One Bank F.S.B.*, 99 Ohio St.3d 390, 2003-Ohio-4122, 792 N.E.2d 1105, at ¶ 39 (in considering the legal issue of federal preemption of state statutes).

{¶ 61} Accordingly, we affirm the judgment of the court of appeals insofar as it bears on this issue.

## II

### CREATION OF UNAUTHORIZED TRIBUNALS

{¶ 62} It is somewhat difficult to decipher and fairly characterize Shimko's arguments in support of his second proposition of law. He seems to argue in the first instance that a bar association has no authority under DR 2–107(B) to "order" an attorney to arbitrate a fee dispute "before a body created by the bar association." Shimko describes this "body" as "a separate tribunal in the form of the arbitration panel of a local bar association."

{¶ 63} The CBA, however, did not order Shimko to arbitrate his fee dispute with Lobe; the "order" (or requirement) to arbitrate emanates from DR 2–107(B). The CBA has merely accepted jurisdiction of a dispute that arose under the rule. Moreover, we fail to understand how the arbitration panel that will eventually be selected to determine the dispute between Shimko and Lobe constitutes an entity distinct from the CBA, since that panel will consist of members of the bar (and particularly members of the CBA). In any event, providing the arbitral machinery for determining a fee dispute between attorneys from different firms is precisely what DR 2–107(B) authorizes the CBA to do.

{¶ 64} Shimko also argues that "DR 2–107(B) is an unreasonable restriction on the right to a trial by jury because the Supreme Court of Ohio does not have the authority to create a tribunal for the purpose of exercising judicial power to hear and determine actions such as the dispute between Mr. Shimko and Mr. Lobe." Shimko then cites *State ex rel. Ramey v. Davis* (1929), 119 Ohio St. 596, 165 N.E. 298, paragraph three of the syllabus, and *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 163, 28 OBR 250, 503 N.E.2d 136, for the proposition that "only the General Assembly may create courts inferior to the Courts of Appeals of this State and determine their subject matter jurisdiction."

{¶ 65} However, *Ramey* and *Jemison* have nothing whatsoever to do with arbitration or rules of court, and DR 2–107(B) does not create courts or any other tribunal. The "judicial" power that is being exercised under DR 2–107(B) is administrative, not adjudicative. The rule does not create any adjudicative body but instead requires officers of the court to arbitrate their fee disputes. Thus, we agree with the court of appeals that Shimko's obligation as a practicing Ohio lawyer to abide by the Code of Professional Responsibility "gives the mediators or arbitrators their authority to resolve the fee disputes." 152 Ohio App.3d 742, 2003-Ohio-2200, 790 N.E.2d 335, ¶ 39.

{¶ 66} The judgment of the court of appeals is, therefore, affirmed as to this issue.

### III

### CONCLUSION

{¶ 67} Based on the foregoing, we hold that DR 2–107(B) does not infringe upon the right of trial by jury as guaranteed by Section 5, Article I of the Ohio Constitution.

{¶ 68} Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

MOYER, C.J., F.E. SWEENEY, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

PFEIFER, J., dissents.

---

**PFEIFER, J., dissenting.**

{¶ 69} Nothing in DR 2–107(B) makes fee-dispute arbitrations final, binding on the parties, or unappealable. Thus, the rule as written does not raise any constitutional problems. We should leave it as written and apply it as written.

---

Timothy A. Shimko & Associates Co., L.P.A., Timothy A. Shimko and David A. Welling, for appellant.

Jones Day, Fordham E. Huffman and J. Todd Kennard, for appellee Cleveland Bar Association.

Eugene P. Whetzel, for appellee Ohio State Bar Association.