**The PEOPLE of the State of Colorado, Petitioner–Appellee,**

**In the Interest of T.D., Jr. and S.D., Children, and Concerning M.A. and T.D., Respondents–Appellants.**

No. 05CA0731.

Colorado Court of Appeals, Div. II.

March 9, 2006.

Rehearing Denied May 4, 2006.

Certiorari Denied June 26, 2006.*

---

* Justice COATS and Justice EID would grant as to the following issue:

Whether the court of appeals correctly found that in light of the Adams County Department of Social Services conflict of interest with the parents, it could and did make reasonable efforts to reunite the family.

James D. Robinson, Adams County Attorney, Deborah Kershner, Assistant County Attorney, for Petitioner–Appellee.

Gibson, Dunn, & Crutcher, LLP, J. Gregory Whitehair, Jonathan M. Warner, Monica K. Loseman, Denver, Colorado; John R. Chesteen, Westminster, Colorado, for Respondent–Appellant M.A.

Bruce E. Kirkpatrick, Henderson, Colorado, for Respondent–Appellant T.D.

ROTHENBERG, J.

In this consolidated appeal, M.A. (mother) and T.D. (father) appeal from a judgment terminating their parent-child legal relationships with their children, T.D., Jr. and S.D. We affirm.

### I. Background

In early 2004, the parents' two children were removed from the home by the Adams County Department of Social Services because of concerns about its unsafe physical condition. A dependency and neglect petition was filed, an adjudication order was entered, and the children were placed in a foster home.

During their visitations, the parents noticed bruising on the children and reported it to the department. They claim their concerns were ignored or minimized. Shortly thereafter, T.D., Jr. suffered a traumatic head injury while in foster care, which required that he be hospitalized for about a month and resulted in permanent injury. The parents testified that this event caused them considerable anguish and that, thereafter, they both had difficulty cooperating with the department in implementing their treatment plans. On behalf of T.D., Jr. they retained counsel, who filed a lawsuit against the department and certain of its employees.

The parents had separate trial counsel, and they have separate appellate counsel, who did not serve as trial counsel during the termination proceedings.

The parents' appeal was filed after the effective date of C.A.R. 3.4, which was adopted by the Colorado Supreme Court. The rule expedites appeals in dependency and neglect proceedings and makes significant changes in the way such appeals proceed in this court.

In her petition on appeal, mother challenged the constitutionality of the new rule as applied to her. She raised several issues, and we requested supplemental briefs addressing them. We later requested additional briefs from all parties addressing whether there was a conflict of interest between the department and the parents in this case, and if so, the appropriate remedy.

### II. Constitutional Issues

Mother contends that by expediting dependency and neglect appeals, C.A.R. 3.4 interferes with her right of access to the judicial process, and violates her rights under the Due Process and Equal Protection Clauses of the federal and state constitutions. She maintains that C.A.R. 3.4 deprives her of fundamentally fair appellate review by (1) failing to provide an opportunity for full briefing in all dependency and neglect appeals; (2) requiring the court, rather than the appellant, to decide which issues require written argument; and (3) forcing appellant's counsel to rely "on an incomplete record, including an informal transcript," and therefore depriving the appellant of the effective assistance of appellate counsel. We reject each of her arguments in turn.

### A. Court of Appeals Jurisdiction

We have found no published cases in Colorado directly resolving whether we have jurisdiction to address the constitutionality of a rule promulgated by the Colorado Supreme Court, and other states are divided on the manner in which the constitutionality of a state supreme court rule may be challenged. Although none of the parties have raised this issue, we conclude it is appropriate first to address our jurisdiction. *See Davidson Chevrolet, Inc. v. City & County of Denver,* 138 Colo. 171, 174, 330 P.2d 1116, 1118 (1958)("Every court has judicial power to

hear and decide the question of its own jurisdiction.").

Appellate courts in Florida and Tennessee have upheld the authority of the trial court or intermediate court of appeals to construe supreme court rules when applying them to given cases, but have concluded this authority does not extend to nullification of the rules. *See Ser–Nestler, Inc. v. Gen. Fin. Loan Co.,* 167 So.2d 230, 232 (Fla.Dist.Ct. App.1964)("The Supreme Court is vested with the sole authority to promulgate, rescind and modify the rules, and until the rules are changed by the source of authority, they remain inviolate."); *Barger v. Brock,* 535 S.W.2d 337, 342 (Tenn.1976)("[T]he inferior courts of the state may not entertain any suit or action challenging the validity of any Rule of this Court. Such a suit would be in the nature of a bill of review or to impeach a judgment of this Court . . . .").

Other states, including Arizona, North Carolina, Ohio, and Texas, have allowed the constitutionality of a supreme court rule to be challenged in a litigated case. For example, the Texas Supreme Court upheld the jurisdiction of the state's lower courts to decide, in the first instance, the constitutionality of its rules, provided there is a real case or controversy before the court:

> Because the Court's power to regulate the practice of law is an administrative one, the exercise of that power does not in and of itself deprive lower courts of general subject matter jurisdiction over challenges to that governance. They do not, however, have jurisdiction over *all* such challenges because in every individual case, jurisdiction also depends on justiciability. . . . [T]here must be a real controversy between the parties that will be actually resolved by the judicial relief sought.
>
> . . . .
>
> . . . Had this Court actually promulgated rules establishing a pro bono program and had Gomez challenged the constitutionality of such rules, the district court would have jurisdiction to decide, in the first instance, whether such rules met constitutional standards. In due course, we would review any adverse determination in our adjudicative capacity. . . . Such a case would be

justiciable because the district court would be capable of rendering a judgment that accords the parties complete relief, subject of course to appellate review.

*State Bar v. Gomez,* 891 S.W.2d 243, 245–46 (Tex.1994) (citations omitted); *see also Chenault v. Phillips,* 914 S.W.2d 140, 142 (Tex.1996)("[C]onstitutional challenges to rules enacted by this Court must be brought in the district court and heard by this Court in the exercise of its appellate jurisdiction."). *But see Sherman v. State,* 12 S.W.3d 489, 494 (Tex.App.1999)(refusing to address challenge to the constitutionality of a rule promulgated by the Texas Court of Criminal Appeals, the state's court of last resort for criminal appeals, stating: "As an intermediate appellate court, we are not the appropriate forum to do so.").

In *State v. Meek,* 8 Ariz.App. 261, 445 P.2d 463 (1968), a majority of the Arizona Court of Appeals held that, as an intermediate appellate court, it lacked jurisdiction to determine the validity of rules promulgated by the Arizona Supreme Court. However, the Arizona Supreme Court, on a petition for review, remanded the case to the court of appeals "with directions to determine [the] case on [its] merits." *State v. Meek,* 9 Ariz.App. 149, 151, 450 P.2d 115, 117 (1969).

> On remand, the court of appeals stated:
>
> This indicates to us that the Arizona Supreme Court is in accord with the statements as to this Court's position announced in the dissent of our previous opinion in *State v. Meek.* We now hold that the Arizona Court of Appeals has the power to determine the validity and constitutionality of the rules promulgated by the Arizona Supreme Court in connection with a case before us.

*State v. Meek, supra,* 9 Ariz.App. at 151, 450 P.2d at 117.

Similarly, in *Beard v. North Carolina State Bar,* 320 N.C. 126, 128, 357 S.E.2d 694, 695 (1987), an attorney filed an action in the trial court when his license to practice law was suspended because he refused to pay into the Client Security Fund, as required by an order of the North Carolina Supreme Court. The supreme court stated that "a

direct challenge of the constitutionality of an order of this Court" "must be litigated as an original action in the General Court of Justice." *Beard v. N.C. State Bar, supra,* 320 N.C. at 128, 357 S.E.2d at 695.

In an Ohio case, the court of appeals simply considered the constitutionality of a supreme court rule without questioning whether it had authority to do so. *See Shimko v. Lobe,* 152 Ohio App.3d 742, 751, 790 N.E.2d 335, 342 (2003)(court of appeals upheld constitutionality of court rule, noting that its decision was "in accord with courts in other jurisdictions which have encountered similar constitutional challenges to court rules that require attorney fee arbitration"), *aff'd,* 103 Ohio St.3d 59, 813 N.E.2d 669 (2004).

Some state supreme courts have expressly provided for the filing of petitions challenging their orders and rules directly with that court. *See Aldridge v. Watling Ladder Co.,* 275 Ark. 225, 226, 628 S.W.2d 322, 323 (1982)(holding that a case involving construction of supreme court rule should have been certified to supreme court under Supreme Court Rule 29(1)(c)); *Goetz v. Harrison,* 153 Mont. 403, 404, 457 P.2d 911, 912 (1969) (questions involving the constitutionality of a supreme court rule should "perhaps" be presented to the supreme court in an "appropriate original proceeding" or in the federal district court). Currently, Colorado has no such provision.

The Colorado Court of Appeals is a statutorily created court. Section 13–4–102(1)(b), C.R.S.2005, provides, as relevant here, that "the court of appeals shall have initial jurisdiction over appeals from final judgments of the district courts, the probate court of the city and county of Denver, and the juvenile court of the city and county of Denver, except in ... [c]ases in which a statute, a municipal charter provision, or an ordinance has been declared unconstitutional." The statute does not otherwise limit this court's authority to address constitutional issues.

*Yeager v. Quinn,* 767 P.2d 766 (Colo.App. 1988), also offers some guidance. There, judges in Boulder County Court filed a declaratory judgment action in the district court regarding the validity of a directive issued by the Chief Justice of the Colorado Supreme Court, which provided for the replacement of county court reporters by electronic audio recording devices. The trial court entered summary judgment denying them preliminary injunctive relief and dismissed their complaint.

The county court judges appealed and a division of this court affirmed the district court, concluding the directive was a valid exercise of executive authority by the Chief Justice. There was no suggestion that the court of appeals lacked jurisdiction to address the validity of a Chief Justice Directive.

Later, in *Office of State Court Administrator v. Background Information Services, Inc.,* 994 P.2d 420, 431 (Colo.1999)(quoting *Bye v. Dist. Court,* 701 P.2d 56, 59 (Colo. 1985)), the Colorado Supreme Court rejected the contention that a Chief Justice Directive was of no effect because it was not an order or rule of the court, stating: "Chief Justice Directives ... are policy statements promulgated pursuant to this court's general power to administer the Colorado judicial system." The supreme court cited *Yeager v. Quinn, supra,* with approval.

If the court of appeals has jurisdiction to address the authority of a Chief Justice Directive, which is tantamount to a court order or rule, *see Office of State Court Adm'r v. Background Info. Servs., Inc., supra,* it seems reasonable to conclude the court of appeals has jurisdiction to address the constitutionality of a supreme court rule. *Cf. People. v. Drum,* 194 Ill.2d 485, 743 N.E.2d 44 (2000)(the interpretation of a supreme court rule is treated like interpretation of a statute, i.e., as a question of law that is reviewed de novo); *People v. Phillips,* 468 Mich. 583, 663 N.W.2d 463 (2003)(same).

Also, unlike cases involving attorney discipline, which are exclusively within the authority of the Colorado Supreme Court, *see Colo. Supreme Court Grievance Comm. v. Dist. Court,* 850 P.2d 150 (Colo.1993), the issues we address in this appeal impact only one court in Colorado—this court—and it is highly unlikely that a challenge to the rule would or could be raised in any forum other than this court or the Colorado Supreme

Court. Indeed, a challenge to the constitutionality of C.A.R. 3.4 would be premature until a party in a dependency and neglect case has filed a notice of appeal in the court of appeals, and the supreme court is under no obligation to grant certiorari or to invoke its original jurisdiction to issue an extraordinary writ. Thus, our refusal to address this constitutional issue may mean that appellants, such as mother here, have no forum for their arguments.

■ Because our supreme court has not spoken to the jurisdictional issue, and for the other reasons set forth above, we therefore conclude we have jurisdiction to address mother's challenge to the constitutionality of the rule.

### B. Due Process

■ When the state seeks to terminate the relationship between a parent and child, it must comply with the Due Process Clause, which requires a fundamentally fair procedure. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *B.B. v. People*, 785 P.2d 132 (Colo. 1990); *People in Interest of A.M.D.*, 648 P.2d 625 (Colo.1982).

■ For procedural due process purposes, fairness is assessed by application of the three-factor test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), which requires consideration of three distinct factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See C.S. v. People in Interest of I.S.*, 83 P.3d 627 (Colo.2004); *People in Interest of A.M.D., supra.*

In *M.L.B. v. S.L.J.*, 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), the Supreme Court concluded Mississippi's requirement that an indigent mother pay for a transcript before she could appeal a decree terminating her parental rights violated her rights to due process and equal protection. The Supreme Court noted that "[d]ue process and equal protection principles converge" in cases concerning access to judicial processes, and that "[t]he due process concern homes in on the essential fairness of the state-ordered proceedings anterior to adverse state action." *M.L.B. v. S.L.J., supra*, 519 U.S. at 120, 117 S.Ct. at 566 (quoting *Bearden v. Georgia*, 461 U.S. 660, 665, 103 S.Ct. 2064, 2068–69, 76 L.Ed.2d 221 (1983)).

Although the Court in *M.L.B.* did not address *Mathews v. Eldridge, supra*, it nonetheless applied the *Mathews* three-pronged approach by identifying the private interest affected (the forced termination of mother's parental rights) and the governmental interest (the legitimate interest in offsetting the costs of its court system). The Court equated the appeal of a termination of parental rights case to the appeal of a petty offense, and relying on *Mayer v. City of Chicago*, 404 U.S. 189, 198, 92 S.Ct. 410, 416, 30 L.Ed.2d 372 (1971), held that "Mississippi may not withhold from M.L.B. 'a record of sufficient completeness' to permit proper [appellate] consideration of [her] claims." *M.L.B. v. S.L.J., supra*, 519 U.S. at 128, 117 S.Ct. at 570.

■ In this case, it is undisputed that parents have a fundamental liberty interest in the care, custody, and management of their children, *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *B.B. v. People, supra; People in Interest of A.M.D., supra;* and both parents and children have an important interest in a continuing family relationship. *See People in Interest of C.A.K.*, 652 P.2d 603 (Colo.1982); *People in Interest of A.M.D., supra.*

■ However, the state also has a significant interest in finalizing a dependency and neglect proceeding in an expeditious manner to meet the child's emotional and psychological needs for a permanent home. *See* § 19–1–102(1.6), C.R.S.2005.

■ We conclude that the private interests of a parent who is affected by an appellate proceeding, while extremely important, do not outweigh the state's interests in pro-

tecting the safety and other needs of children in dependency and neglect cases. Therefore, in order to resolve the due process issue, we consider the risk of an erroneous deprivation of mother's appellate rights and the probable value, if any, of additional or substitute procedural safeguards. *See Mathews v. Eldridge, supra.*

■ There is no constitutional right to appeal, *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), but once a state has created such a statutory right, the procedures afforded to secure that right must comport with due process and equal protection. *M.L.B. v. S.L.J., supra; Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966)("This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts."); *People v. Rivera–Bottzeck*, 119 P.3d 546 (Colo.App.2004).

Colorado has created a statutory right to appeal in dependency and neglect proceedings. Section 19–1–109(1)–(2), C.R.S.2005.

The Colorado Supreme Court adopted C.A.R. 3.4 in response to the federal and state law shift in focus from family reunification to "time-limited family reunification services." *See* 42 U.S.C. §§ 629a(7), 675(5) (2000); §§ 19–1–102(1.6), 19–1–109(3), 19–1–115(7), 19–1–123, 19–3–100.5, 19–3–604(2)(k), 19–3–702, 19–3–703, C.R.S.2005. Section 19–1–109(3) created a "Child Welfare Appeals Workgroup" to submit a written report to the General Assembly to consider necessary statutory or other changes. The goal of the legislature was to ensure that appeals in dependency and neglect cases be completed within six months after being filed. *See People in Interest of A.J.H.*, 134 P.3d 528 (Colo. App. No. 05CA1129, Feb. 23, 2006).

Retired court of appeals judge, Karen S. Metzger, and Judge Karen M. Ashby, Chief Judge of the Denver Juvenile Court, are the co-chairs of the Court Improvement Committee, a proponent of the rule. Both of them appeared at a public hearing before the Colorado Supreme Court on January 25, 2005, concerning the proposed rule and explained that it is modeled on a rule adopted in Iowa. *See In re C.M.*, 652 N.W.2d 204 (Iowa 2002)(applying similar Iowa appellate rule); *In re R.K.*, 649 N.W.2d 18 (Iowa Ct.App. 2002)(same).

Judge Metzger stated that, based on case studies, approximately 100 dependency and neglect cases per year were filed in the court of appeals, and that it then took one year from the filing of the notice of appeal until the mandate issued. Judge Metzger further stated: "The proposed rule 3.4 does not change the substantive, qualitative analysis for these kinds of appeals. Instead, it's the belief of the Court Improvement Committee ... that it does what federal and state law mandates us to do, quite candidly, move cases expeditiously through the system." Tape recording of public hearing before the Colorado Supreme Court (Jan. 25, 2005).

C.A.R. 3.4 requires an appellant to file a petition raising issues for appeal, instead of arguing issues as in a traditional brief. C.A.R. 3.4(g)(3). The petition is due within twenty days of the filing of the notice of appeal, C.A.R. 3.4(g)(1), and the opposing party has twenty days thereafter to file a response. C.A.R. 3.4(h)(1). The record on appeal, which includes designated transcripts of hearings before the trial court, *see* C.A.R. 3.4(e)(3), must be transmitted to the court of appeals within forty days of the filing of the notice appeal. C.A.R. 3.4(f)(1).

Some, but not all judicial districts in Colorado currently have the technology to prepare transcripts quickly. Hence, in some cases, the new rule's filing requirements may preclude the use of the complete record by appellate counsel in preparation of the petition or response, as occurred here where mother relied on an "informal transcript."

Nevertheless, the rule provides that the parties may request a copy of an unedited transcript from the court reporter, giving appellate counsel the opportunity to identify the issues for review, to summarize the relevant facts, and to provide supporting legal authority, *see* C.A.R. 3.4(e)(6). While that opportunity admittedly depends on the quality of the unedited transcript, the rule does

not prevent counsel from requesting leave to supplement the petition or response, if an examination of the completed record convinces counsel that manifest injustice would otherwise result. C.A.R. 3.4(i) also allows appellate counsel to request oral argument, and C.A.R. 3.4(k)(1) provides for a petition for rehearing.

After the required documents are filed, the court of appeals—acting through one of its three-judge divisions—then reviews the petition on appeal, any responses to the petition, and the trial court record. The assigned division, which has access to the completed record, is responsible for verifying appellate counsel's statement of facts and application of the law to the facts.

The division may affirm, reverse, or vacate the trial court's decision, remand the case to the trial court, or request supplemental briefing by the parties addressing issues raised by them or noticed by the division itself. C.A.R. 3.4(j)(2). Although the authority to request supplemental briefing is explicit in the new rule, it is not a new practice. Divisions of this court have requested counsel to address issues noticed by the division in numerous civil, criminal, and administrative cases. *See, e.g., People v. Krutsinger,* 121 P.3d 318 (Colo.App.2005); *People v. Turley,* 109 P.3d 1025 (Colo.App.2004); *Roberts v. Am. Family Mut. Ins. Co.,* 113 P.3d 164 (Colo.App.2004), *cert. granted,* 2005 WL 1006492 (2005).

The rule requires that the proceedings be advanced on the court of appeals' calendar. C.A.R. 3.4(j)(1). Thus, the division must promptly affirm the order of termination and free the child for adoption, or reverse the order and allow the reunification of the child and parents. This expedited procedure benefits the parents by quickly correcting decisions in which their rights were terminated erroneously. The expedited procedure also benefits children, whose parents have had their rights terminated by the trial court, by decreasing the time they are in "legal limbo" and either returning them to their parents or permitting legal adoption. *See In re C.M., supra; In re R.K., supra.* Accordingly, the latter benefit furthers the state's interest in protecting children.

Apart from her challenge to the quality and the timeliness of the informal transcripts, mother also contends the rule violates due process because it improperly requires an appellant to make a preliminary showing that the appeal is meritorious. Alternatively, she maintains that the rule forces the members of the division to prejudge the appeal in deciding when to order supplemental briefs. We disagree.

A considerable number of the appeals from termination cases challenge the sufficiency of the evidence, the adequacy of the treatment plan, and the existence of less drastic alternatives to termination. These challenges are to the factual, not the legal, determinations made by the trial court, and they require the division to examine the record for any support of the trial court's findings. Under the new rule, the division can do so because it has the entire record before issuing a decision.

Relatively few appeals raise purely legal issues or complex factual issues that cannot be resolved by established precedent. The issues raised in such cases require a more thorough analysis by counsel and the division. The rule allows the division to order supplemental briefing in such cases, indeed, in all cases, and thus provides the parties such an opportunity.

Thus, the expedited process does not alter the division's responsibility to examine thoroughly the record on factual issues, and contrary to mother's contention, it does not place the division in the role of an advocate on legal issues.

We acknowledge that the new rule is not perfect. *See In Interest of N.A.T.,* 134 P.3d 535 (Colo.App. No. 05CA1512, Mar. 9, 2006)(Román, J., dissenting). However, in assessing the risk of erroneous deprivation the new rule may cause, we bear in mind that parents in a termination case have already been afforded the full panoply of due process rights in the trial court.

Our job is not to second-guess the factual decisions of the trial court or interfere with the exercise of its discretion. The duty of an appellate court is to review the

record for legal error and to correct such error if it affected the fairness and outcome of the proceedings. *See* C.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). The new rule does not prevent us from performing this duty.

In summary, we reject mother's contention that the accuracy of the transcript initially available to her, the timeliness of the complete transcript, and the expedited process in which the assigned division reviews the appeal and reaches its decision, violate her right to procedural due process. We conclude that she was provided with a record of sufficient completeness to permit proper consideration of her claims on appeal, *M.L.B. v. S.L.J.*, *supra*, 519 U.S. at 128, 117 S.Ct. at 570, and that the new rule sufficiently protects parents in dependency and neglect cases against the risk of an erroneous deprivation of their appellate rights (1) by allowing appellate counsel for the parents a reasonable opportunity to review an unedited transcript and to raise possible issues for appeal, and (2) by allowing the assigned division of the court of appeals to review the complete record and order supplemental briefing when appropriate. *See Mathews v. Eldridge*, *supra; In re R.K.*, *supra* (concluding Iowa's expedited appellate procedure in termination appeals does not violate a parent's right to due process); *see also United States v. Marines*, 535 F.2d 552 (10th Cir.1976)(concluding court's summary calendar, which permits more limited briefing, does not violate due process as long as defendant is able properly to present issues on appeal); *People v. Rivera–Bottzeck*, *supra* (concluding that limiting the length of a defendant's brief on appeal did not violate his right to due process where he was not forced to abandon any issues).

In reaching our conclusion that mother's constitutional right to due process was not violated by the expedited procedure required under C.A.R. 3.4, we also observe that there are several ways in which trial courts can alleviate the problems raised by counsel in this appeal and assist this court in performing its function.

For example, the trial court can (1) identify in its findings and written order any difficult or novel legal issues that arose during the proceedings; (2) require that before trial counsel is permitted to withdraw and be replaced by a different appellate counsel, trial counsel file a written statement identifying any difficult or novel legal issues that arose during the proceedings; and (3) require that trial counsel personally confer with appellate counsel shortly after filing the notice of appeal to assist in identifying issues on appeal.

The trial court can also alleviate appellate delay by reducing its oral findings and conclusions to writing immediately. Counsel cannot file a notice of appeal until there is a final judgment, which requires a written and signed order by the trial court. *See* C.R.C.P. 58(a). Further, the trial court can ensure that there is no delay by the clerk's office in assigning a court reporter to prepare the record.

## C. Equal Protection

Mother also contends C.A.R. 3.4 violates her constitutional right to equal protection under U.S. Const. amend. XIV and Colo. Const. art. II, § 25, because parents whose rights are terminated under article 5 of the Colorado Children's Code, *see* §§ 19–5–105, 19–5–203, C.R.S.2005, are not subject to the expedited appellate procedure set forth in the rule, nor are those parents whose custodial rights are affected in other civil actions. We conclude those parents are not similarly situated and therefore reject mother's argument.

Equal protection of the law requires that the government treat similarly situated persons in a similar manner. A distinction between classes or groups of people, whether created by a statute or rule, must have some relevance to the purpose for which the classification is made. When governmental action is subjected to an equal protection challenge, the level of judicial scrutiny varies with the type of classification employed and the nature of the right affected. *Tassian v. People*, 731 P.2d 672, 674 (Colo.1987).

■ To state an equal protection violation, a person must establish that he or she received treatment different from that afforded to similarly situated persons. *People v. Oglethorpe*, 87 P.3d 129 (Colo.App.2003). Thus, the threshold question in any equal protection challenge is whether the persons allegedly subject to disparate treatment are in fact similarly situated. If they are not, the equal protection challenge must fail. *See People v. Watkins*, 126 P.3d 309 (Colo.App. 2005).

The overriding purpose of the Children's Code is to protect the welfare and safety of children by providing a procedure through which their best interests can be served. *L.G. v. People*, 890 P.2d 647 (Colo.1995).

The distinction created by C.A.R. 3.4 is between parents subject to dependency and neglect proceedings under article 3 of the Colorado Children's Code and parents subject to relinquishment and adoption proceedings under article 5 of the Code or other civil proceedings that may affect their parental rights.

However, dependency and neglect proceedings focus primarily on the protection and safety of children susceptible to harm from the effects of abuse and neglect, not on the custodial interests of the parent. *L.G. v. People, supra; People in Interest of C.M.*, 116 P.3d 1278 (Colo.App.2005). In such proceedings, an order affecting a parent's custodial rights may not be made until after the children have been adjudicated, which requires a determination that the children's custodial circumstances or other aspects of their environment are detrimental to them and must be altered. *L.A.G. v. People in Interest of A.A.G.*, 912 P.2d 1385 (Colo.1996); *People in Interest of C.M., supra.*

Further, a proceeding in dependency and neglect may only be initiated by the state, *L.A.G. v. People in Interest of A.A.G., supra; L.G. v People, supra*, which has a compelling interest in the speedy, permanent disposition of a child who has been adjudicated dependent and neglected. *See* §§ 19–1–102(1.6), 19–1–109(3), 19–1–115(7), 19–1–123, 19–3–100.5, 19–3–604(2)(k), 19–3–702, 19–3–703; *People in Interest of E.I.C.*, 958 P.2d 511 (Colo.App.1998).

Although stepparent adoptions and relinquishment proceedings may result in the involuntary termination of a parent's rights, *see* §§ 19–5–105(3.1), 19–5–203(1)(j)–(k), C.R.S.2005, they are not initiated by the state, and the state is not a party to the proceedings. Nor is the state a party to other civil proceedings, such as dissolution of marriage or grandparent visitation proceedings under the Uniform Dissolution of Marriage Act (UDMA), § 14–10–101, et seq., C.R.S.2005, in which a parent's custodial rights might be affected. Further, proceedings under article 5 of the Code or under the UDMA generally do not involve a situation where the child is exposed to an injurious environment. *See* § 19–5–100.2, C.R.S.2005; *L.A.G. v. People in Interest of A.A.G., supra.*

■ We therefore conclude that parents, such as mother, whose rights are involuntarily terminated in a dependency and neglect proceeding pursuant to article 3 of the Children's Code, are not similarly situated with parents whose rights are terminated under article 5 of the Code. *See* §§ 19–5–105, 19–5–203, C.R.S.2005. Thus, mother has not established the threshold requirement for an equal protection challenge.

### D. Effective Assistance of Counsel

■ Mother next contends C.A.R. 3.4 violates the federal and state constitutional right to effective assistance of counsel because the lack of a complete record prevents appellate counsel from adequately developing and presenting the issues on appeal. We are not persuaded.

■ Once counsel is appointed, a parent is entitled to effective assistance, *S.S. v. Wakefield*, 764 P.2d 70 (Colo.1988), and the standards used to assess effective assistance in a criminal case apply. *People in Interest of V.M.R.*, 768 P.2d 1268 (Colo.App.1989).

To establish a claim of ineffective assistance of counsel, a parent must show that counsel's performance fell below the level of reasonably competent assistance and that counsel's deficient performance was so prejudicial as to deprive the parent of a fair

hearing. *People in Interest of V.M.R., supra.*

As discussed, C.A.R. 3.4 provides access to an unedited transcript for preparation of the petition on appeal and an opportunity to identify the issues on appeal. Verification of counsel's statement of facts is undertaken by the assigned division of the court of appeals, after the complete transcript has been filed. The division must apply the appropriate legal authority cited by counsel to the verified facts in deciding the issues raised in the petition. The division may also undertake its own supplemental research, and order further briefing on any issues.

■ Here, there has been no showing that the unavailability of the complete record under C.A.R. 3.4 resulted in a deficient performance by appellate counsel. *See People In interest of N.A.T., supra; In re L.M.,* 654 N.W.2d 502 (Iowa 2002)(holding that under the similar Iowa rule, the shortened time for filing a petition on appeal, which precludes review of the transcript, does not give rise to a per se claim of ineffective assistance of counsel). In our view, all appellate counsel have done an excellent job of identifying and addressing the issues in this appeal.

### III. Withdrawal of Mother's Counsel

Mother next contends the trial court erred in allowing her court-appointed trial counsel to withdraw. We disagree.

■ A parent has a statutory, not a constitutional, right to appointed counsel in a dependency and neglect proceeding, §§ 19–1–105(2), 19–3–202(1), 19–3–602(2), C.R.S. 2005; *C.S. v. People in Interest of I.S., supra,* and it must be invoked by the parent's timely request for appointed counsel. *People in Interest of L.L.,* 715 P.2d 334 (Colo.1986); *People in Interest of L.A.C.,* 97 P.3d 363 (Colo.App.2004); *People in Interest of V.W.,* 958 P.2d 1132 (Colo.App.1998).

■ Here, counsel was appointed to represent mother shortly after the petition in dependency and neglect was filed. Six months later, she asked her counsel to withdraw. She informed the court that she was dissatisfied with counsel's performance and that she intended to hire private counsel.

The court found there was a conflict between mother and counsel and allowed counsel to withdraw. Mother proceeded pro se for over two months, despite the trial court's repeated suggestions that new counsel be appointed. When the department of social services expressed its intention to pursue termination, the trial court advised mother that it was perilous to proceed without counsel, and she then requested and received another appointed counsel.

We therefore perceive no error in the trial court's order allowing counsel to withdraw, and we reject mother's contention that her statutory right to court-appointed counsel was violated.

### IV. Insufficiency of Motion to Terminate

■ We also reject mother's argument that the motion to terminate her parental rights was insufficient because it failed to specify the factual grounds for termination. A motion to terminate is sufficient so long as it is couched in the statutory language set forth in § 19–3–604(1), C.R.S.2005, as it was here. *See People in Interest of C.A.J.,* 709 P.2d 604 (Colo.App.1985); *People in Interest of M.H.,* 683 P.2d 807 (Colo.App.1984).

### V. Sufficiency of the Evidence

Both parents contend the evidence was insufficient to support the criteria for termination. We disagree.

■ To terminate the parent-child legal relationship pursuant to § 19–3–604(1)(c), C.R.S.2005, clear and convincing evidence must establish that the child has been adjudicated dependent or neglected; that an appropriate treatment plan, approved by the trial court, has not been complied with by the parent or has not been successful in rehabilitating the parent; that the parent is unfit; and that the parent's conduct or condition is unlikely to change within a reasonable time. *People in Interest of A.M.D., supra.*

■ When appropriate, the department must make reasonable efforts to reunify the family. Section 19–3–100.5(1); *see* § 19–3–604(2)(h), (k)(III), C.R.S.2005. "Reasonable efforts" means the exercise of diligence and

care for children who are placed out of the home, but the primary considerations in a termination proceeding are the physical, mental, and emotional conditions and needs of the children. Section 19–3–604(3), C.R.S. 2005; *People in Interest of D.B–J.,* 89 P.3d 530 (Colo.App.2004); § 19–3–604(3), C.R.S. 2005.

The reasonable efforts standard is met if services are provided in accordance with § 19–3–208, C.R.S.2005. *See* § 19–3–100.5(4), C.R.S.2005. Among the efforts required of the department are an assessment of the family, development of a case plan for the provision of services, and visitation services. Section 19–3–208.

### A. Adequacy of the Treatment Plan

The parents contend the trial court erred in finding the treatment plan was appropriate. We disagree.

A treatment plan is appropriate if it "is reasonably calculated to render the particular [parent] fit to provide adequate parenting to the child within a reasonable time" and "relates to the child's needs." Section 19–1–103(10), C.R.S.2005.

■ The purpose of a treatment plan is to preserve the parent-child relationship by assisting the parent in overcoming the problems that led to the dependency adjudication. Its appropriateness is measured by the likelihood of success in reuniting the family, which must be assessed in light of the facts existing at the time of its approval. *People in Interest of M.M.,* 726 P.2d 1108 (Colo.1986).

■ Absolute compliance with a treatment plan is not required. *See People in Interest of C.L.I.,* 710 P.2d 1183 (Colo.App. 1985). On the other hand, partial or even substantial compliance with a plan may still not result in success if it does not correct or improve the parent's conduct or condition. *See People in Interest of C.A.K., supra; People in Interest of D.L.C.,* 70 P.3d 584 (Colo. App.2003).

Where, as here, the proceedings concern a child under the age of six, § 19–3–604(1)(c)(I)(B), C.R.S.2005, provides that the treatment plan is not successful if:

[t]he parent exhibits the same problems addressed in the treatment plan without adequate improvement, including but not limited to improvement in the relationship with the child, and is unable or unwilling to provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions.

■ In making its findings, the trial court must consider the totality of the evidence, *People in Interest of J.E.B.,* 854 P.2d 1372 (Colo.App.1993), and it should attribute more weight to the most recent reports and evaluations. *People in Interest of L.D.,* 671 P.2d 940 (Colo.1983); *People in Interest of V.W., supra.*

■ The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the discretion of the trial court. A trial court's findings and conclusions will not be disturbed on review if the record supports them. *People in Interest of C.A.K., supra.*

In this case, the court approved a treatment plan requiring that the parents (1) complete hair follicle tests to detect drug use and undergo substance abuse evaluations if the tests were positive; (2) attend supervised visits with the children; (3) maintain employment; (4) participate in domestic violence evaluations and follow any recommendations; and (5) participate in psychological evaluations. The treatment plan thus attempted to address the problems that required the initial intervention and related to the children's need for a safe home.

#### 1. Father's Treatment Plan

■ Father generally asserts that the trial court's findings concerning the criteria for termination were not supported by clear and convincing evidence. We disagree.

Father lacks standing to raise issues concerning termination of mother's rights. *See People in Interest of J.M.B.,* 60 P.3d 790 (Colo.App.2002). Thus, we address his contentions only insofar as they concern the termination of his own parental rights.

Father's treatment plan was identical to mother's, which was designed to address the family's problems. However, his anger toward the department, while understandable, remained so intense and unabated as to completely interfere with his compliance with the plan. He shaved his head and body to delay the hair follicle test, refused to participate in domestic violence counseling, and did not follow through with mental health treatment as recommended by his psychological evaluation.

At the time of the termination hearing, he had not completed a single therapeutic component of the treatment plan, and he exhibited the same problems as those initially addressed by the treatment plan. The court thus found, with record support, that he was unable or unwilling to provide nurturing and safe parenting to the children. See § 19–3–604(1)(c)(I)(B), C.R.S.2005. Pointing to father's history of violence, his repeated threats of harm to the social worker, and his failure to make any progress, the court found that he was unfit and that his conduct or condition was unlikely to change within a reasonable time.

We conclude the evidence was sufficient to support the trial court's findings as to father, and they may not be disturbed on review. See People in Interest of C.A.K., supra.

### 2. Mother's Treatment Plan

Mother's situation was considerably different from that of father. Although she initially was uncooperative and did not begin to comply consistently until six months after the treatment plan had been approved by the trial court, she then began to make considerable progress. By the time of the termination hearing, the court found that "she [had] substantially complied with many components of the treatment plan for the last seven months." She had separated from father and was living in a shelter, but she was also pregnant with a third child by father.

The trial court found that while the separation was indicative of improvement, mother still maintained frequent contact with father, who had not addressed the domestic violence issues. Because of this, the court was concerned that the separation was not perma-nent and that the addition of a third child would frustrate mother's ability to meet the children's needs. After reviewing all of the evidence and making extensive findings, the trial court stated that "[i]t was with a tremendous sense of sadness ... that it must find [the department] has met its burden."

While reasonable persons may have reached a different conclusion, we conclude there is record support for the trial court's finding that mother did not successfully comply with the treatment plan and that termination was warranted. Therefore, those findings may not be disturbed on review. See People in Interest of C.A.K., supra.

In reaching our conclusion, we reject mother's assertion that the separation of the children from her was not in their best interests and that the treatment plan did not relate to the children's needs. The order placing the children out of the home was separate from the treatment plan, which addressed the problems that required intervention into the family and related to the children's need for a safe home, free from substance abuse and domestic violence. Further, mother did not object to the treatment plan.

Accordingly, we reject mother's contention that the treatment plan was inappropriate. See People in Interest of M.S., 129 P.3d 1086 (Colo.App.2005)(concluding father was precluded from challenging the appropriateness of his treatment plan because he stipulated to it and failed to request modification).

### B. Department's Reasonable Efforts and Conflict of Interest with Parents

The parents also contend the department failed to make reasonable efforts to reunite the family after T.D., Jr. suffered a traumatic head injury while in foster care. They maintain that the department should have been removed from this case because it had a conflict of interest with the parents. We conclude there is record support for the trial court's finding that the department made reasonable efforts to reunite the family after T.D., Jr. suffered the injury. We further conclude the department had a conflict of interest in this case but the fact that the trial

court sua sponte did not disqualify the department does not require reversal of the judgment.

The department denies that it had such a conflict. We are not persuaded. It is undisputed that T.D. Jr.'s debilitating and permanent brain injury was sustained early in the proceedings at the foster home selected by the department, and that the parents, in their capacities as T.D. Jr.'s representatives, were suing the department for that injury. The trial court was incensed when it learned the child had suffered injuries while in foster care. At a hearing early in the proceedings, the court found that on February 2, 2004, T.D. Jr. had "suffered catastrophic, non-accidental head trauma resulting in permanent brain damage at the hands of his foster parent," and it ordered a criminal and civil investigation of the foster home. S.D. was moved to another foster home, as was T.D. Jr. when he was released from the hospital.

Further, there was evidence that before this incident occurred, the parents had complained to the social worker assigned to their case about that foster home and had reported seeing bruises on both of the children. The parents maintain that the social worker disregarded their complaints and that their relationship with the department deteriorated significantly after their son was injured. They were very distrustful of the department and livid about their child's injury, and both parents became uncooperative. Father was openly hostile to the social worker and others in the department.

The court was informed by the parents' counsel that a civil suit had been filed against the department for the physical and emotional harm done to the children while in the abusive foster home. As father asserted in his supplemental brief:

After the lawsuit was filed, the same professionals remained responsible for [mother] and her children in the dependency and neglect action. It goes against reason to think the parties at issue could ignore their need to defend themselves from liability in the civil action and, at the same time, work diligently toward reunifying [mother] with her children. In fact, the State and its employees had every incentive to try to prove that [mother] was unfit and that her children's problems were attributable to her alleged bad parenting. For this additional reason, [mother] must be able to press her appeal in as full and effective a manner as possible so that this [c]ourt can exercise the oversight function to which M.A. is entitled.

In *People in Interest of J.A.M.,* 907 P.2d 725 (Colo.App.1995), a division of this court reversed a judgment of the juvenile court terminating a parent-child relationship, concluding that the child's guardian ad litem should have been disqualified from the proceedings. The division reasoned:

[D]uring the permanency planning hearing, the GAL recommended termination of the parent-child legal relationship, as did the Department, and stated that she had arrived at her position independently. However, the independent judgment of the GAL could have been compromised by her employment with the Department.

Furthermore, the conflict of loyalties inherent in the GAL's dual roles as a representative of the child's best interests and as an employee of the Department necessarily casts doubt on the fairness and impartiality of the legal system in the public eye.

For these reasons, we conclude that the juvenile court erred in failing to disqualify the GAL.

*People in Interest of J.A.M., supra,* 907 P.2d at 726 (citations omitted).

Likewise, in *Petition of Department of Social Services to Dispense with Consent to Adoption,* 384 Mass. 707, 429 N.E.2d 685 (1981), the Massachusetts court disqualified the department of social services from presenting the Commonwealth's cases, where department employees sought to become preadoptive parents. The court explained that the department has "vastly superior resources for investigation and presentation of its case," that "judges place great confidence in the reports of the department," and therefore, that "the department is extraordinarily influential in its capacity to interfere with family relationships between parents and children." *Petition of Dep't of Soc. Servs.,*

*supra,* 429 N.E.2d at 688 (quoting *Dep't of Pub. Welfare v. J.K.B.,* 379 Mass. 1, 393 N.E.2d 406, 408 (1979)); *see also In re S.D.A.,* 170 N.C.App. 354, 612 S.E.2d 362, 365 n. 4 (2005)(noting that the "North Carolina Division of Social Services Family Services Manual also permits referral to a sister county when a conflict of interest exists").

█ We agree with the statement of the court in *In re Eduardo,* 57 Mass.App.Ct. 278, 782 N.E.2d 551, 553 (2003), that "[t]here need be no per se rule that the mere pendency of litigation by a parent against DSS requires disqualification of DSS as an advocate against that parent in a custody case." As the Massachusetts court observed, "such an inflexible approach is not required to preserve the integrity of the process and could lead to undesirable litigation strategies." *In re Eduardo, supra,* 782 N.E.2d at 553.

█ However, this case involves much more than "the mere pendency of litigation by a parent," against the department. The parents' lawsuit in this case was filed on behalf of T.D., Jr. and the department's actions seeking to terminate their rights, if successful, would affect their ability to act on his behalf in T.D., Jr.'s lawsuit. We thus conclude there was a conflict of interest between the department and the parents. The department should have moved to withdraw and should have requested that the court appoint the department of social services in another county to proceed. In no event should the same social worker have remained on this case.

The appearance of fairness is just as important as the reality of fairness. As we have observed, there was evidence showing the department made considerable efforts to engage the parents in treatment and to provide the services ordered by the court and required under the treatment plan. But there was also evidence that the department's employees, who oversaw mother's treatment plan, told her to "get over" the issue of T.D., Jr.'s brain injury, were critical of her when she failed to cooperate or participate with the department for five months after he was injured, and made crucial recommendations to the court, including that the parents' visitation be limited. Thus, the parents were justified in questioning the objectivity of the department and the social worker.

█ While the issue is close, we nevertheless conclude reversal is not warranted for the following reasons. First, when the court learned of the child's injury, it ordered the department to provide all reasonable services requested by the parents to facilitate their treatment plans. Among the services provided were supervised and therapeutic visits, domestic violence counseling, substance abuse treatment, and psychological treatment for the parents and the children. The court also appointed a special advocate (CASA volunteer) to provide an independent review of the case and to speak on behalf of the best interests of the children. *See* § 19–1–201, et seq., C.R.S.2005. Hence, the department was monitored very closely by the trial court.

Mother participated in these services, but unfortunately waited until five months after the child was injured to begin her treatment plan in earnest. *See People in Interest of L.A.C., supra.*

Second, the trial court granted every request made by the parents' counsel. When mother's counsel first informed the court of the conflict, she asked that an independent expert be appointed, and the court stated that it had already done so. Third, while mother's counsel indicated to the court her intent to file a "formal" request of some kind, and father's counsel also raised the issue, neither counsel ever moved to disqualify the department or sought to preclude department employees from testifying at any of the hearings.

Fourth, the trial court's order, issued after the termination hearing, makes it clear that the court primarily relied on the independent expert it had appointed, and did not rely on the social worker. The court also noted that throughout much of the proceedings, the expert and the CASA volunteer had consistently advocated for the parents and they did not uncritically accept the department's recommendations. And fifth, much of the department's evidence regarding the mother's ability to parent the children was corroborated

by the testimony of mother's therapist and the children's therapist.

We conclude there is record support for the trial court's finding that the department made reasonable efforts to reunite the family. We further conclude the trial court's failure sua sponte to disqualify the department based on a conflict of interest does not require reversal.

In reaching our conclusion, we have not overlooked the parents' observation that by affirming the judgment, we are, in effect, removing their ability to act on behalf of the child in his lawsuit against the department and its employees. We assume the child's guardian ad litem will bring this matter to the attention of the juvenile court and request an order clarifying who now has standing to act on behalf of the minor child in that civil action.

## VI. Suspension of Visits Without Hearing

Mother also complains that the trial court suspended her visits with the children nine months before the termination hearing without conducting an evidentiary hearing. She asserts that the trial court improperly delegated the decision to resume visitation to the children's therapist and the independent therapeutic visit supervisor.

However, the visits were suspended after a review hearing, and the court considered the recommendations of the children's therapist and the therapeutic visit supervisor. These recommendations were presented to the court by the department and the guardian ad litem. Mother did not object to the procedure followed by the trial court, did not ask that an evidentiary hearing be conducted, and did not object to the trial court's delegation of authority to reinstate visits.

We therefore conclude her arguments were not properly preserved for appeal. *See People in Interest of V.W., supra; see also People in Interest of B.C.,* 122 P.3d 1067 (Colo.App.2005).

## VII. Less Drastic Alternative

Finally, the parents contend the trial court erred in rejecting permanent placement of the children with family friends in North Carolina as a less drastic alternative to termination. Mother argues that the finding was based on an error concerning North Carolina law and that the trial court could have imposed protective orders to resolve the perceived problems. We disagree.

The court must also consider less drastic alternatives before entering an order of termination. *C.S. v. People in Interest of I.S., supra; People in Interest of M.M., supra.* The primary considerations in a termination proceeding are the physical, mental, and emotional conditions and needs of the child. Section 19–3–604(3); *People in Interest of D.B–J., supra.*

Permanent placement is not a viable alternative to termination if the proposed caregiver lacks appreciation of the parent's problems or of the child's conditions or needs. *See People in Interest of D.B–J., supra.* Permanent placement is also foreclosed if the child needs the stability and permanency of adoption. *People in Interest of E.I.C., supra; People in Interest of S.T.,* 678 P.2d 1054 (Colo.App.1983).

According to the home study conducted pursuant to the Interstate Compact on Placement of Children, § 24–60–1801, et seq., C.R.S.2005, it would have taken six months for the family to get licensed as a North Carolina foster home. Because the family had not met the children and may have lacked full appreciation of their needs, the home study advised against placing the children into their home.

The therapeutic visit supervisor and the children's therapist testified that the children suffered from reactive attachment disorder stemming from their early childhood experience with the parents. With therapy, they had begun to form an attachment with their foster parents, who intended to adopt them if freed for adoption. The children's therapist believed that disruption of the attachment process would be detrimental to the children and recommended that they remain with their foster family and become available for adoption.

224

Based on this evidence, the trial court rejected a permanent placement with the family in North Carolina, finding as follows:

> The proposed custodians, although very decent, educated and well-meaning people, will not qualify for guardianship under the laws of North Carolina for six months. They are strangers to these children. This Court sees no benefit to the children in removing them from a stable, [foster-adoptive] home where they are doing well into a home with strangers. This will not serve their best interests. Additionally, these children need the permanency that only adoption can provide.

We conclude the trial court's findings rejecting permanent placement with the North Carolina family are supported by the record, and they may not be disturbed on review. *See People in Interest of D.B–J., supra.*

Judgment affirmed.

VOGT and LOEB, JJ., concur.